Mildred Ciskoski, Administratrix of Estate of Clarelain Urban, Deceased, Appellee, v. J. M. Michalsen, Appellant.

Mildred Urban, Administratrix of Estate of William X. Urban, Deceased, Appellee, v. J. M. Michalsen, Appellant.

Gen. No. 47,279.

First District, Second Division.

July 3, 1958.

Released for publication September 18, 1958.

329

Philip J. Slotnikoff, of Chicago (Edward J. Fleming, of counsel) for appellant.

Jack L. Sachs, and John C. Mullen, both of Chicago (Gerald M. Chapman, of counsel) for appellees.

JUSTICE MURPHY delivered the opinion of the court.

These are personal injury actions to recover damages for the deaths, through asphyxiation, of William X. Urban and Clarelain Urban, his wife. The actions were consolidated in the trial court. The jury assessed damages at $20,000 for the death of William and of $12,000 for the death of Clarelain. Judgments were entered on the verdicts. Defendant appeals.

Mr. Urban was 26 years of age, a certified public accountant, and with a life expectancy of 43.33 years. His wife was 25 years of age, employed, and with a life expectancy of 49.28 years. They were survived by two minor children, a boy of 4 years and a girl of 21 months.

At approximately noon, Sunday, May 25, 1952, Mrs. Rose Corsiglia, mother of Mrs. Urban, using a key, entered the Urbans' second floor apartment and found her daughter, son-in-law and their two children, unconscious. The Urbans and their son were lying on a davenport in the living room, which was customarily used by them as a bed. The daughter was in an adjoining bedroom. All were clad in night clothes. Neither Mr. nor Mrs. Urban regained consciousness. She died the same day, and he died about 13 days later. The cause of both deaths was carbon monoxide poisoning.

Defendant J. M. Michalsen was the owner of the apartment building, located at 3845 North Paulina Street, Chicago, Illinois. The building was two stories high, of an older type, and containing a number of apartments, rented to various tenants. The Urbans had occupied a 4-room apartment since the latter part of 1949.

Mrs. Corsiglia and a married son occupied apartments in the same building. She entered through the kitchen door and became aware of heat from the lighted gas hot water heater, located in that room. All windows in the apartment were tightly closed. She shut off the gas and turned on the bathroom faucets, which caused steam to pour through the apartment. She then entered the living room and found the Urbans (all unconscious). The police, firemen, a gas company worker and a newspaper photographer, were soon on the scene.

Mrs. Corsiglia testified that she saw the gas company employee (who died before the trial) pull the gas hot water heater vent pipe out of the chimney; that the opening of the chimney was completely plugged with soot; that he scooped the debris out of the opening into a dishpan; and that subsequently she placed the debris in a shopping bag, enclosing a piece of that day's newspaper, and put the pan and the bag with its contents and paper into a large box and put them away. They were received in evidence, and a witness for defendant said the debris contained "very little soot. It is more of a mortar sand." A police lieutenant testified he saw the gas company employee "removing something or other from the hole in the wall, the combination of soot and rust and what have you."

A newspaper photographer identified plaintiffs' exhibits 1, 2 and 3 as prints of photographs taken by him and correctly portraying the scene he witnessed when he entered the Urban apartment. Exhibits 1 and 3 are photographs showing firemen applying pulmotors and administering oxygen to Mr. and Mrs. Urban, who are unconscious on the davenport bed in the living room.

The gas hot water heater had a 3-inch vent pipe leading into a circular entrance hole in the wall, 6 inches in diameter and extending through 5 inches to

332

a flue, which terminated just above the roof. The flue chamber leading to the roof was rectangular. The flue chamber ended about 5 inches below the 6-inch entrance hole, forming a well about 5 inches deep. The flue was one of two flues in a common brick chimney, separated by a 4-inch brick wall. One flue serviced the Urban second floor apartment, and the other serviced the first floor apartment. The Urban apartment flue had but two openings—the 6-inch inlet hole leading from the kitchen and the other opening, being the outlet, where the flue ended just above the roof. The chimney, containing the two flues, had 4-inch brick walls, one wall being flush with and a part of the building wall. The two flues were side by side, so that the back of each flue chamber was part of the external building wall. The front of the chimney extended into the building proper, with each apartment inlet hole being directly opposite the external wall. The two flues project above the roof, each ending with a 24-inch circular tile extension.

The gas hot water heater was lighted with a match and turned off and on by hand. It had been installed in the apartment previous to the occupancy of the Urbans and had been used by the Urbans from time to time to heat water during their two-year occupancy, prior to the occurrence. There was no testimony by anyone as to the removal of the vent pipe leading into the flue chamber at any time prior to the date of the occurrence. Apparently the Urbans were month-to-month tenants, and there is no testimony to indicate any agreement on behalf of the landlord to make repairs to the apartment rented to the Urbans.

The principal question is whether or not the landlord defendant retained sufficient control of the flue chamber involved in this case, to give rise to a duty to maintain it in a reasonably safe condition, and precluding a finding in his favor as a matter of law.

■ In the absence of special agreement, a tenant takes the premises as he finds them, subject to his own risk, and there is no implied covenant that they are fit for habitation or that they are in any particular condition of repair. Farmer v. Alton Building & Loan Ass'n, 294 Ill. App. 206, 212, 213 (1938); Shields v. J. H. Dole Co., 186 Ill. App. 250, 255, 256. ·

■ ■ It is well settled that a landlord is not responsible for defects in the premises at the time of the letting, unless they were latent, and the landlord has been guilty of fraud and deceit in the letting, nor is he bound to repair unless he has expressly agreed so to do at the time of the letting. May v. DiCenso, 277 Ill. App. 248, 255 (1934). Also, it is the rule that where the landlord rents the premises to several tenants, retaining control over a part of the same for the common use of the several tenants, he has the duty of exercising reasonable care to keep the premises in a reasonably safe condition, and he is liable for an injury which results to persons lawfully in such place, from failure to perform such duty. B. Shoninger Co. v. Mann, 219 Ill. 242, 245 (1906); Murphy v. Illinois Trust Co., 375 Ill. 310, 313 (1941).

Payne v. Irvin, 144 Ill. 482, involved personal injuries received by a tenant, caused by a signboard being blown from the roof of a one-story building. The tenant occupied one room in the premises. There was no agreement about maintenance of the roof and the outside of the building. It was the landlord who used the sign on the roof. The tenants at no time assumed or exercised any control over the building, other than the premises they occupied. On p. 488, the court said:

"The landlord, as to that portion of the building, and appurtenances, over which he retains control, must be held to also retain the responsibility to keep the same in reasonable repair in respect of all persons, including the tenants of the building."

On p. 489:

"The questions of whether appellee was chargeable with notice of the insecure condition of the sign-board, and whether its falling was the result of an extraordinary wind, which reasonable foresight could not have guarded against, were each fairly submitted to the jury as questions of fact."

█ In Burlingham v. Gordon, 201 Ill. App. 474 (1916), on p. 476, the court quoted from 1 Taylor on Landlord and Tenant, sec. 175a, where it is said:

"A demise of parcels out of a building leaves the responsibility for what is not demised, upon the landlord. The roof, halls and passages not demised, chimneys, eaves and outside walls, remain in the landlord's charge."

This rule was again quoted in Campbell v. Banks, 257 Ill. App. 354 (1930).

Defendant contends that, as the Urban flue chamber was used only by them, with the single inlet opening in the kitchen and the other opening being its outlet and termination in the roof, the defendant landlord was not responsible for the maintenance of the portion of the premises leased to and under the control of the Urbans, including the flue chamber used by them, and that the plaintiff failed to prove such common use of the chimney and flue as to place them under defendant's control and the duty of maintaining them. The earlier description of the chimney shows that it was so constructed as to use the external wall of the building, to make up part of the chimney enclosure, and that a 4-inch brick partition separated the two flue chambers. The testimony indicated that the debris contained very little soot and was "more of a mortar sand."

██ The general rule is that if there is any evidence in the record tending to support an essential element of the case, it becomes a question of fact to be

335

submitted to the jury. In view of the rule in Burlingham v. Gordon, previously quoted, that the landlord is responsible for the roof, chimneys, eaves and outside walls, we believe that there was sufficient evidence in the record for the trial court to submit to the jury the issue as to whether or not the flue chamber in question was part of a common chimney, under the control of the defendant, and the reasonably safe and secure condition of which he had the responsibility of maintaining.

■ Plaintiffs' instruction No. 9, i. e., "The Court instructs the jury that there is an implied duty upon a landlord to keep in a reasonably safe condition the common chimneys retained under his control and used by the several tenants as a means of conveying the products of combustion to the outside air, and that a landlord is liable for injuries received by any person lawfully on the premises because of the landlord's negligence in performing such a duty. If you find from a preponderance of the evidence, that the defendant rented apartments to different tenants and retained under his control the chimneys and that said chimneys were used in common by the tenants, then, under the law the defendant was required to use reasonable care to keep the said chimney in a reasonably safe condition," correctly informed the jury as to the law on this point.

■ Defendant contends there was no complaint or notice to defendant as to the condition of the chimney or flue. A witness for defendant, in being cross-examined as to his experience with reference to the accumulation of soot, testified: "I have seen soot in my experience and when soot falls down it accumulates gradually over a period of time. It is not true that a lot of it is formed of a lot of little particles of carbon of some sort. It is mortar. It is washed off from the brick. . . . Soot is carbon. You don't get soot and such from gas. You don't get fluffy carbon." In indi-

cating the debris in evidence, he said: "I say that is very little soot. It is more of a mortar sand." Under these circumstances, it was a question of fact for the jury whether the defendant was chargeable with notice or knowledge of the condition of the chimney in question. B. Shoninger Co. v. Mann, supra.

■ Defendant's instruction No. 5 informed the jury that plaintiffs were required to prove by a preponderance of the evidence that defendant knew, or in the exercise of ordinary care might have known, that the chimney or flue was completely blocked with soot, and "If the jury believe from the evidence that the plaintiffs have failed to prove by a preponderance of the evidence that the defendant knew or by the exercise of ordinary care might have known that the chimney or flue was completely blocked with soot then they should find the defendant not guilty." We believe the evidence and the instructions were sufficient to properly place before the jury the issue of the defendant's notice of the alleged defective condition of the premises.

Defendant contends that the trial court committed a number of reversible errors in the admission of plaintiffs' evidence, i. e., (1) the receipt in evidence of plaintiffs' exhibits 1 and 3, being photographs of the scene portraying the firemen administering to the unconscious Urbans; (2) the admission of the answer of plaintiffs' expert to a hypothetical question; and (3) testimony as to the careful habits of the decedents.

■ In Pitrowski v. New York, C. & St. L. R. Co., 6 Ill.App.2d 495, this court discussed the rule with reference to the admission of photographs and said:

"If the evidence has a reasonable tendency to prove some material fact in issue, such evidence may properly be admitted, and the question is one properly within the discretion of the trial court. . . . When a photograph is relevant, the mere fact that it may have a

337

tendency to prejudice the jury is not sufficient to justify its exclusion. It is a matter within the court's discretion."

 We believe the admission in evidence of the complained of photographs was carefully considered by the trial court. At that point in the trial, defendant did not concede any cause of death, and the arguments of counsel, regarding the admission of these photographs indicates that they could have had a tendency to prove the cause of death. In the light of the circumstances presented to the trial court, we do not believe the admission to be an erroneous abuse of discretion.

 A witness for the plaintiffs was qualified as an engineer, with a specialty in the design of mechanical systems and electrical systems for buildings. He testified he had examined the premises. He was requested to answer a hypothetical question which assumed stated facts to be true and which called for his opinion, as an engineer, whether or not "there might be or could be a causal connection between the blocked up flue and chimney as described in this question and the unconscious condition of the people as described in the question." This question was properly objected to, because he would be invading the province of the jury in this case, as the ultimate question, for the jury to determine, was whether there was a causal connection between the physical state of the Urbans and the condition of the flue in their apartment. However, the affirmative answer did not seriously prejudice the defendant, because the only medical testimony was that the Urbans died as a result of carbon monoxide poisoning, and there was no testimony as to any other source of carbon monoxide in the premises. We do not believe this to be reversible error in this case.

 In an effort to demonstrate that the decedents were in the exercise of ordinary care and caution for their own safety, plaintiffs introduced testimony as to

338

the careful habits of the decedents, which included testimony by the family doctor as to the care and attention given the Urban children by their parents on frequent visits to his office. This testimony included observations that the children were clean, dressed neatly and were very well taken care of. We agree with defendant that there was sufficient evidence before the jury on the question of due care and caution on the part of the decedents, and that the complained of testimony was improper for the purpose offered. However, we do not believe it to be prejudicial in the instant case, because the age and life expectancy of the Urbans and the extreme youth of their children would arouse the sympathy of the jury, without any evidence of parental solicitude.

■ We conclude that the instant situation comes within the rule set forth in Seeds v. Chicago Transit Authority, 409 Ill. 566, that if this court finds there is any evidence, standing alone, which fairly tends to prove the material elements of plaintiffs' case, and after consideration of the other alleged errors, this court determines that the cause was properly submitted to the jury, a verdict will not be set aside merely because the jury could have drawn different inferences or other conclusions. This is especially so where there is no claim that the verdicts are excessive.

The judgment of the trial court is therefore affirmed.

Affirmed.

LEWE, P. J. and KILEY, J., concur.