Dorrence Kenneth Darling II, a Minor, by His Father and Next Friend, Dorrence Kenneth Darling, Plaintiff-Appellee, v. Charleston Community Memorial Hospital, a Corporation, Defendant-Appellant.

Gen. No. 10,501.

Fourth District.
June 30, 1964.

260

261

Jack E. Horsley and John P. Ewart, of Craig & Craig, of Mattoon (Wayne O. Shuey, of Charleston, of counsel), for appellant.

Stanford S. Meyer, of Belleville, and John Alan Appleman, of Urbana, for appellee.

CROW, P. J.

This action was brought by the plaintiff Dorrence Kenneth Darling II, a minor, by his father and next friend, Dorrence Kenneth Darling, to recover damages allegedly occasioned by the alleged negligence of the defendant, Charleston Community Memorial Hospital, an Illinois not for profit corporation, in the furnishing of hospital services to the plaintiff. Originally, there was another defendant, Dr. John R. Alexander, a medical doctor,—Count I being against the Hospital, and Count II against the Doctor. The ad damnum in each Count was $207,430. The injured plaintiff had ultimately lost one of his legs. The defendant's motions for directed verdict at the close of the plaintiff's evidence and of all the evidence were denied. The plaintiff's motion for a directed verdict at the close of all the evidence was allowed as to the issue of contributory negligence and denied in all other respects. The jury rendered a verdict for the plaintiff for $150,000. Prior to trial the plaintiff had settled with the other defendant, Dr. Alexander, the plaintiff receiving $40,000 in consideration of a covenant not to sue Dr. Alexander, and he had been dismissed as a defendant. The defendant hospital's motion for setoff in that respect, to which there was no objection, was allowed, after the verdict. The defendant filed a post-trial motion in arrest of judgment, for judgment notwithstanding the verdict, for a new trial, and for correction of the amount of the verdict and judgment. This was denied except as to the credit for the foregoing $40,000. The post-trial motion, briefly, urged the complaint, as amended at the trial, did not state a cause of action and is not sufficient to sustain a judgment for the

264

plaintiff; there is no competent evidence, with its intendments most favorable to the plaintiff, to make a prima facie case against the defendant; there were errors in the voir dire examination of the jury, the verdict is clearly and palpably against the manifest weight of the evidence, the amount of the verdict is excessive and indicates passion, prejudice, and sympathy, the defendant's motions for directed verdict should have been allowed, the jury did not deliberate long enough, the court erred in permitting the plaintiff's amendments to the complaint at the close of the plaintiff's evidence, the ad damnum should have been reduced to $100,000, there were errors in the rulings on evidence, the issue of contributory negligence should have gone to the jury, there were errors in the instructions, and plaintiff's counsel abused the privilege of argument; and the amount of the verdict should be corrected to $100,000, or alternatively, there should be a $40,000 credit on the verdict. The court reduced the verdict to $110,000, and entered judgment for $110,000, from which this appeal is taken by the defendant hospital. The defendant hospital had made a motion to reduce the ad damnum of Count I to $100,000, alleging it was incorporated under the General Not for Profit Corporation Act of Illinois, it is operated as a charitable and scientific organization not for profit, and the only funds available to satisfy any judgment against it, other than trust funds held for specific uses and funds held for expansion, improvements, developments and such hospital purposes as the board of directors deems necessary, are the proceeds of an insurance policy, the limits of which are $100,000. This was supported by the affidavit of the hospital administrator, a copy of the liability policy, and a copy of the articles of Incorporation. That motion, uncontroverted, was denied. The post-

265

trial motion, inter alia, had asked that the verdict and judgment be reduced to $100,000 for the same reasons, which motion, as indicated, was denied in that regard. The defendant's notice of appeal prays that we reverse the judgment and enter judgment for it, notwithstanding the verdict, or arrest the judgment, or allow a new trial, or reduce the judgment to $100,000.

The trial required approximately two weeks. The evidence was extensive, and the record, abstracts, and briefs here are lengthy.

On Saturday, November 5, 1960, the plaintiff, Dorrence Kenneth Darling II, was a student at Eastern Illinois University in Charleston. He was a member of the football team, and on that afternoon he was playing defensive left halfback during a game. A member of the opposing team threw a block at him, and he sustained a broken right leg. He was carried from the field on a stretcher to the field house and received emergency care from Dr. William Heath, a doctor associated with the university. He was then taken to the defendant Charleston Community Memorial Hospital, in Charleston.

On November 5, 1960 the Charleston Hospital had a forty-six bed capacity. It was a member of the American Hospital Association and was accredited by the Joint Commission on Accreditation. It was licensed by the State of Illinois. It had been open since September, 1957. The following hospital personnel were available in the medical-surgical area during the shifts designated:

1. 7:00 a.m. to 3:00 p.m. shift:
 Two registered nurses—one was a supervisor and the other a medicine nurse—three licensed practical nurses, one graduate practical nurse, a female aid and a male aid.

266

2. 3:00 p.m. to 11:00 p.m. shift:
 A hospital supervisor, two registered nurses, a medicine nurse, three licensed practical nurses and two male aids.
3. 11:00 p.m. to 7:00 a.m. shift:
 One registered nurse, two licensed practical nurses, and one aid. On five nights out of the week, there was one additional registered nurse.

There was also a surgical department which had a registered nurse, a licensed practical nurse, and a female aid. The surgery and emergency room was on a call-back basis during the shifts from 3:00 p.m. to 11:00 p.m. and 11:00 p.m. to 7:00 a.m. A registered nurse and a licensed practical nurse were subject to call during those shifts. The hospital also had a laboratory which was approved by the State of Illinois Department of Health. During the 7:00 a.m. to 3:00 p.m. shift, there were two full-time technicians, certified as American Medical Technicians, and one part-time technician. During the shifts from 3:00 p.m. to 11:00 p.m. and 11:00 p.m. to 7:00 a.m., the lab personnel were on a call-back basis. Many tests could be performed and carried out in the laboratory. Also, the laboratory facilities of the Mattoon Memorial Hospital, Mattoon, and the Burnham City Hospital, Champaign, were available to the Charleston Hospital. Also available was a registered pathologist at the Burnham City Hospital. There was no orthopedic medical staff at the defendant hospital. There was no designated surgical staff, though at a medical staff meeting November 9, 1960, after the plaintiff's injury and while he was in the hospital, a certain other doctor had been appointed Chairman of the Surgical Division. Dr. Alexander had been "qualified" by approval of the Board of Directors of the hospital to perform sur-

gery. There was an active medical staff. There was a consulting medical staff. There were two orthopedic surgeons, Dr. Ross and Dr. Peterson, of Champaign, on the consulting staff. The Medical Staff had an executive committee and a medical records committee. In evidence are photographs of certain parts of certain walls of the hospital indicating a sign "Medical-Surgical-Nursing," and also a list of the various laboratory tests available at the hospital.

The plaintiff was brought into the emergency room of the Charleston Hospital sometime between 3:00 p.m. and 4:00 p.m. Lelia Carroll, a surgical scrub nurse (sterile nurse who assists doctors), had completed her shift at 3:15 p.m., but had not left the hospital. Patricia Jenkins, the director of Nurses, found Miss Carroll before she had an opportunity to leave, and asked her to stay and assist in the emergency room. Dr. John Alexander, a graduate of the University of Illinois, was called and asked to come to the hospital. Dr. Alexander had been on the medical staff since the new hospital was started, and before that he was on the old Charleston Hospital staff. On this day, he was the doctor on emergency call. He examined the leg and had an X-ray taken. He diagnosed a comminuted (multiple) fracture of the right tibia and fibula (what he described as a "bad break"). Mary LaVan, a certified registered nurse anesthetist, was called to the emergency room. Also present in the emergency room, besides Mrs. LaVan, Doctor Alexander, and Miss Carroll, were Mrs. Bezruki, a nurse, and Steve Goodson, an orderly. Miss Carroll filled out a form entitled "Authority to Operate," and the injured plaintiff signed it while in the emergency room. He was then anesthetized. Miss Carroll asked Doctor Alexander if he wanted any stockinette (knitted cloth, like a stocking) to use under the cast, and he said "No." While Steve Goodson held the plaintiff's leg,

Dr. Alexander wrapped muslin around it or part of it. Pursuant to Dr. Alexander's instructions, Miss Carroll applied traction by holding the patient's right thigh and pulling the leg towards the body. At the same time, Dr. Alexander applied countertraction by pulling the end of the patient's foot away from his body. When Dr. Alexander was satisfied that he had proper traction, he asked Mrs. Bezruki to take the position of Miss Carroll, and Steve Goodson to take his position and they continued to apply traction and countertraction. Dr. Alexander then applied the cast material ("Quick setting" cast, he called it). Eight plaster rolls were applied and then X-rays were taken to determine if there was good alignment and good reduction. After these X-rays had been taken and examined, the injured plaintiff was then returned to the emergency room and two more plaster rolls were applied. The cast covered the leg from a point three or four inches from the groin to the toes. The toes were left exposed. The leg was again X-rayed and there was good alignment and good reduction. The plaintiff was taken to a hospital room and placed in bed. This was a two-bed room and in the other bed was an elderly patient who, in Dr. Alexander's best recollection, was a "bladder case." Two pillows were placed under the injured plaintiff's right leg, and then Dr. Alexander ordered and placed over the cast, in order to help dry it, a heat cradle containing two fifteen watt bulbs. Pursuant to Dr. Alexander's order, the heat cradle was removed about twenty-four hours after it had been placed over the cast. The plaintiff was in the Charleston Hospital from November 5, 1960 until November 19, 1960. In evidence are a heat cradle, sample equipment used or available in casting, a bottle of Dr. John's cold-pain-fever pills, photographs of the emergency room, photographs of the patient's room, and

269

a plat of the hospital. Various X-rays were in evidence but are not reproduced in the abstracts.

During this period the Charleston Hospital kept a complete record relating to the plaintiff. Included in the hospital record was the "nurse's record" or nurse's notes. For the Doctor's information, the nurses made many notations concerning their observations about the injured plaintiff's condition. Some of the principal notations from November 5, 1960 through November 8, 1960, when the cast was split in its entirety, were as follows:

1. November 5, 1960—4 p.m., chymar 1 cc— Heat cradle over rt. leg, and cast—demerol 2 cc—for pain—6 p.m. S. R. D. 1 gm.—7 p.m. demerol 2 cc—pain in leg—toes swollen— very restless—10 p.m.—heat lamp to leg—

2. November 6, 1960—12 a.m., chymar 1 cc—foot very edematous—toes warm to touch—demerol 2 cc—2 a.m. complains of pain in frax. limb— carbital given for pain—2:35 a.m. still complains of pain—demerol given—5 a.m. complains of severe pain in frax. limb—demerol 2 cc given for pain—7 a.m. chymar 1 cc— carbital—complained of pain—3 p.m. chymar 1 cc—complains of pain in leg—toes appear very swollen—color good and warm— appears blisters on his foot—5 p.m. carbital— 7 p.m. Dr. Alexander here, cast cut at top of foot by Dr., foot elevated on 4 pillows, heat cradle removed—

3. November 7, 1960—12 a.m., chymar 1 cc—irrational—demerol 2 cc—complains of pain in frax. limb—4 a.m. complains pain in injured limb, foot very edematous and dark, color better when placed on more pillows— 7:30 a.m.—carbital—8 a.m. chymar—8:30 a.m. demerol 2 cc., cold, pain, fever tabs.—Dr. Alex-

270

ander visited—complains of pain in leg—10 a.m. large blister on foot, toes swollen, states no feeling in toes on being touched—10:30 a.m. restless—2 p.m. complains of severe pain in leg, toes feel cold to touch and slight cynotic —7 p.m. petromul—complaining of severe pain, toes very tight, becoming more dusky in color—Dr. Alexander here, cast cut approx. 3 inches up foot by Dr.—9 p.m. moaning, unable to settle down—10:30 p.m. complaining again of pain.

4. November 8, 1960—chymar 1 cc—complains of severe pain in frax. limb—demerol 2 cc given for pain—3 a.m. very restless—5:30 a.m. carbital—foot and toes still swollen and cold— 6 a.m. demerol 2 cc—8 a.m. cold, pain and fever pills—9 a.m. Dr. Alexander visited— 10 a.m. complains of pain—11:45 a.m. chymar 1 cc—12 p.m. carbital—1:30 p.m. Dr. Alexander here, cast on R. leg split on sides, retaped, and merthiolate added, also some blisters on foot opened—5 p.m. complains of pain in leg —8 p.m. carbital—complains of pain—10 p.m. demerol 2 cc.—

Some of the notations therein from November 9 to the 19th were:

5. November 9, 1960: "still crying of pain"— "turning head from side to side and crying, rubbing face and hands, elbows very red from twisting and turning, begging for mother"— "begging for 'pills' for pain in leg"—"very poor night, slept only short intervals after medicine"—"says he is in pain"—"complaining of severe pain in right leg after company left."

6. November 10, 1960: "complaining of pain in limb"—"patient asking for pain medicine"

271

—"restless night"—"complaining of pain"—
"complaining of pain"—"complaining of
pain"—"crying of pain"—"poor afternoon"
—"very restless."

7. November 11, 1960: "patient complaining of pain and moaning"—"poor night"—"complaining of pain"—"complaining of dizziness"—"complaining of pain in leg."

8. November 12, 1960: "complaining of pain in leg"—"complaining of pain in leg"—"complaining of pain in leg."

9. November 13, 1960: "complaining of pain in fractured leg"—"complaining of pain."

10. November 14, 1960: "complaining of pain in right leg"—"complaining of pain."

11. November 15, 1960: "complaining of pain in fractured leg"—"complaining of pain in leg"—"leg, foul odor."

12. November 16, 1960: "complaining of pain in right leg."

13. November 17, 1960: "complaining of pain in left leg."

14. November 18, 1960: "restless"—"complaining of pain in leg."

15. November 19, 1960: "medicine given for pain."

Dr. Alexander read the nurse's record. He also received telephone calls from various nursing personnel about the patient's condition. Dr. Alexander visited the patient many times, and he had left written orders for the nurses to follow during his absence from the hospital. The nursing staff carried out the doctor's orders. In his opinion circulation in the leg was satisfactory. He considered this bone setting a major problem, but not major surgery, and that he did not need a doctor assistant. He said he looked at the toes every day. Dr. Alexander testified that, during

272

the plaintiff's stay in the hospital, he did not call any specialist in for consultation, because, in his judgment, everything was all right. The patient received SRD, being penicillin and another drug, chymar, being a drug to reduce swelling, demerol, being a narcotic for pain and relaxation, Dr. Alexander's cold-pain-fever tablets, chloromycetin, being an antibiotic, and carbital, being a sedative and tranquilizer, at various times. On November 8th, for example, from midnight to midnight, in a 24-hour period, demerol was given five times, carbital was given three times, and cold-pain-fever tablets were given three times.

On November 6, at approximately 7:00 p.m., Dr. Alexander cut a "notch" in the cast around the toes. At about 7:00 p.m., on November 7, he cut the cast approximately three inches up the foot. On November 8, between 1:30 p.m. and 3:00 p.m., he split the entire cast by removing a lengthwise strip from it. Dr. Alexander used a Stryker saw (a vibrator type saw) when he cut the cast. A cut on each side of the leg was accidentally made by the cast cutter. An antiseptic was put on and a sterile dressing. The saw was in evidence but a photograph thereof is not reproduced in the abstracts.

The injured plaintiff's parents, who lived in Collinsville, Illinois, arrived at the Charleston Hospital at about 8:30 or 9:00 p.m. on the day of his admission. His father signed the form entitled "Authorization for Medical and/or Surgical Treatment" and "Authorization for Release of Information." They visited their son on many occasions while he was in the hospital. Their last visit was on Saturday, November 19, and the patient left that day, by ambulance for Barnes Hospital in St. Louis. Dr. Alexander put back in place, over sterile dressings, the part of the cast that had previously been cut and removed, prior to that trip.

273

At Barnes Hospital, he was under the care of Dr. Fred Reynolds, the head of orthopedic surgery at Washington University School of Medicine and Barnes Hospital. He remained at Barnes Hospital until December 16, at which time he was permitted to return to his home. He was readmitted to Barnes Hospital on December 27. He remained there two days and again returned to his home. He was readmitted to Barnes Hospital on January 16 and remained until February 7. On January 23, his right leg was amputated at a point below the knee.

The complaint, as amended prior to trial, so far as now material, stated, in substance, at the time of trial and immediately before the amendments made at the close of the plaintiff's evidence:

"4. That the defendant corporation then owed to the said plaintiff a duty to use that degree of skill in the care of such patient as would be exercised by institutions of like kind and character in that county; but that in violation of the duties which the said defendant owed to the plaintiff, the said defendant was guilty of one or more of the following negligent and careless acts or omissions which directly and proximately caused injury and loss to the plaintiff:

A. Permitted surgery to be performed in its operating rooms upon the plaintiff without the consent of said patient or, although the patient was then a minor, the consent of his parents;

B. Permitted the defendant, John D. Alexander, to perform orthopedic surgery upon the plaintiff although the said defendant was not skilled or qualified in the performance of such surgery;

274

C. Permitted assistance in such surgery by a layman not admitted nor licensed to practice medicine in the State of Illinois;

D. Failed to set up standards which would have required the head of the orthopedic staff of such hospital to check upon the operative procedures employed, the casting of the limb, and the post-operative care, so that as a result of such failure improper techniques were followed and utilized;

E. Permitted, or caused, a heat lamp to be used in the drying of such cast in such a manner as to cause blistering of the plaintiff's affected extremities, thereby causing blistering, edema, and subsurface infection;

F. Permitted a cast to be applied at a time which was far too early for the patient's welfare, when the flesh was bruised and swollen, and permitted it to be applied in such a manner as to create and cause infection, and the said defendant by its agents and servants actively assisted in such casting procedures;

G. Used student nurses for post-operative care of the patient who were unskilled in bone injuries and infections resulting therefrom so as not adequately to recognize the presence of infection and to provide care for the patient, or capable of preventing or checking the spread of infection;

H. Used nurses for post-operative care who were not skilled in the recognition of the presence of infection so as to direct the existence thereof promptly to the attention of the attending physician;

I. Used nurses for post-operative care possessing insufficient experience and skill to recog-

275

nize the significance of the symptoms of infection displayed by the patient;

J. Failed to notify the attending physician of the vile odor of the injured area, the patient's constant complaints of pain, and other symptoms which would have apprised the attending physician of the existence of a state of infection;

K. In the light of the symptoms clearly indicating the presence of infection, failed to require consultation with or examination by competent members of the hospital surgical staff and require steps to be taken to prevent the spread of such infection;

L. Failed to use that degree of skill required by law of hospitals in the post-operative care customary for cases of like kind and character in said community;

M. (Withdrawn during the trial.)

N. (Withdrawn during the trial.)

O. That the defendant hospital failed to conform to and to observe one or more of the following standards customarily required of and adhered to by accredited hospitals in the area involved at that time:

(1) Failed to provide a licensed, graduate professional nursing service available to all parties at all times, and particularly to the plaintiff here;

(2) Failed to provide qualified personnel adequate to supervise and conduct the supervision of medical patients and, in particular, the plaintiff here;

(3) Failed to make adequate provision for hematology and serology examinations as pertains to this plaintiff, and to conduct such

other blood tests and examinations as would have disclosed the progressive deterioration of the circulation in this plaintiff's right leg;

(4) Failed to maintain a modern and adequate medical library relating to modern orthopedic methods and casting techniques;

(5) Permitted the defendant physician to be appointed as a member of the active staff when he was not qualified professionally to perform orthopedic surgery, which, as a member of such staff, he was permitted to do;

(6) Failed, through its medical staff, to review the treatment rendered to the plaintiff and violated its duty to make certain that the attending physician in this case did not fail in the matter of calling consultants as needed, there being doubt as to the best therapeutic measures to be utilized, and it being apparent under the circumstances of this case that a qualified orthopedist should have been called into consultation;

(7) Failed to have reports of a tissue committee on orthopedic cases previously handled by the said physician, in order to determine his qualification to do surgery of that type and character, and failed to have monthly meetings to review surgical procedures following in this and in other cases;

(8) Failed to have a sufficient number of licensed, graduate, professional nurses for the bedside care of all patients at all times, and thus failed to have such nurses available for bedside care of the plaintiff at all times capable of recognizing the progressive gangrenous

277

condition of the plaintiff's right leg, and of bringing the same to the attention of the hospital administration and to the medical staff so that adequate consultation could have been secured and such conditions rectified."

To these charges the defendant had filed its answer. The answer, so far as material, admitted the defendant Hospital owed to the plaintiff the duty to use that degree of skill in the care of such patient as would have been exercised by institutions of like kind and character in the County at that time, alleged that it did use such degree of care and skill, and denied the remaining allegations of paragraph 4. As to the amendments at the trial there was a motion for leave to amend certain parts of paragraph 4, made at the close of the plaintiff's evidence. Leave was granted. This was over the objection of the defendant hospital. Nothing was changed in any of the subparagraphs A through O specifying the alleged breaches of duty charged against defendant, except in subparagraph "O" where the words "customarily required of and" were stricken, and the words in the opening part of paragraph 4 "as would be exercised by" were changed to "required of." The defendant interposed an oral, and later a written, motion to dismiss the complaint, as thus amended. The court overruled this motion. The defendant then moved for a continuance, as urged by it, to enable it to prepare its defense to the complaint as thereby amended. This motion was denied. Its original answer was permitted to stand to the complaint as so amended. The defendant's Post-trial Motion, again presented, as indicated, in the form of a Motion in Arrest of Judgment, its Motion to Dismiss the Complaint, as thus amended at the trial.

Plaintiff's Exhibit 8 contains the Rules and Regulations promulgated by the Illinois Department of Pub-

lic Health under the Hospital Licensing Act. The particularly important provisions are:

"Section A of Part II—Administration.

'1. For each hospital there shall be a governing authority, hereinafter called the board, responsible for its organization, management, control, and operation, including appointment of the medical staff. For hospitals owned by an individual or by partners, the owner or partners shall be considered the governing authority. For all other hospitals there shall be a Board of Directors, Board of Trustees or similar governing authority. . . .

'4. The board shall appoint a competent executive officer or administrator and vest him with authority and responsibility for carrying out its policies. There shall be a qualified individual responsible to the administrator in matters of administration who shall represent him during his absence.

'5. The board shall employ competent well-qualified personnel in adequate numbers to carry out the functions of the hospital.

'6. The board shall be responsible for the maintenance of proper standards of professional work in the hospital and shall require that the medical staff function in conformity with reasonable standards of competency.' "

"Part III—The Medical Staff.

"Section A—Organization.

'2. The medical staff shall be organized in accordance with written by-laws, rules and regulations, approved by the governing board. The bylaws, rules and regulations shall specifically provide:

'a. for eligibility for staff membership;

'b. for such divisions and departments as are warranted; (as a minimum, Active and Consulting divisions are required. . . .)

'd. for determination of qualifications and privileges; . . .

'f. for review and analysis of the clinical experience of the hospital at regular intervals —the medical records of patients to be the basis for such review and analysis; . . .

'h. for consultation between medical staff members in complicated cases' ";

"Part IV—Personnel.

"Section B—Nursing Personnel.

'1. The nursing service shall be organized to provide adequate nursing care to each patient; and the authority, responsibility, and function of each category of nurse shall be clearly defined.

'8. It is recommended that supervisors and head nurses have training and experience commensurate with the responsibility of the specific assignment.' "

Plaintiff's Exhibit 15, to the admission of which there was no objection by the defendant, contains the Standards for Hospital Accreditation promulgated by the Joint Commission on Accreditation of Hospitals. These standards provided, in substance, as follows:

"I. Administration

B. Governing Body.

'The governing body is legally and morally responsible for the conduct of the hospital. . . . For effective performance the governing body should do the following:

280

'1. Adopt bylaws in accordance with legal requirements. . . .

'5. Appoint members of the medical staff.

'6. Appoint a qualified hospital administrator who is the official representative of the governing body. The administrator is responsible for the conduct of the hospital, and provides liaison among the governing body, the medical staff, and other departments of the hospital. . . .

'6. Medical Library.

> 'a. The hospital must maintain a medical reference library according to the needs of the hospital. . . .

"II. Medical Staff

'A. Responsibilities.

'The medical staff is responsible for the quality of medical care rendered to patients in the hospital. Maintaining high standards of medical care will depend upon the character of the staff and the effectiveness of its organization to carry out the following duties:

'1. Selection of those recommended for staff appointments and hospital privileges.
'2. Constant analysis and review of the clinical work done in the hospital. . . .
'6. . . . It is the duty of the hospital staff through its chiefs of service and Executive Committee to see that members of the staff do not fail in the matter of calling consultants as needed. A consultant must be well qualified to give an opinion in the field in which his opinion is sought.

281

'B. Membership. . . .

'1. Appointment

'b. Qualifications.

'Members of the staff must be qualified legally, professionally and ethically for the positions to which they are appointed.

'2. Categories

'b. Other categories of the Staff.

'The Consulting Staff shall be recognized specialists willing to serve in such capacity. . . .

"III. Nursing Department.

'Adequate care of the hospital patient requires well-organized and efficient nursing. All hospitals must meet the following requirements for accreditation:

'A. Functions and Responsibilities.

'Nursing care for all patients is a primary responsibility of the nursing department, which must function in close relationship with other services of the hospital, both administrative and professional. . . .

'B. Personnel.

'Personnel engaged for administrative or professional duties must be qualified by training and experience, and demonstrated ability for their assignments. All hospitals must provide nursing personnel to meet the following minimum requirements: . . .

282

'4. An adequate number of professional nurses and ancillary personnel for bedside care.' "

Plaintiff's Exhibit 5, Bylaws, Rules and Regulations of the Medical Staff of Charleston Hospital, to the admission of which there was no objection by the defendant, provided:

"Article II: Purpose.

The purpose of this organization shall be:

1. To insure that all patients admitted to the hospital or treated in the outpatient department receive the best possible care; . . .

Article VIII: Meetings.

11. Consultations.

Except in an emergency, consultation with a member of the Medical Staff will be required in all major cases in which the patient is not a good risk or should the diagnosis appear to be obscure, and also in all first caesarean sections.

13. Surgical Consent.

No patient will be operated on without the written consent of the patient. In the case of a minor, or if he or she be mentally incompetent, their nearest of kin or guardian must be a signatory to the consent; exception being, in case of emergency. . . .

H. All surgeons should review their operative routine at their earliest convenience so that they may be brought up to date and the Operating Room nurses so informed. . . .

18. Emergency Room Regulations, etc.

A. Personnel.

1. Medical.

The Medical Staff will provide medical coverage for emergencies on a rotation basis. A list indicating medical men on duty will be provided and posted by the hospital at all points necessary. The hospital will notify the doctors as to their turn of duty in advance."

Dr. Kenneth Babcock, a witness for the plaintiff, testified that he is the director of the Joint Commission on Accreditation of Hospitals, which is governed by the American Medical Association, the American College of Surgeons, the American College of Physicians, and the American Hospital Association. The Joint Commission is an independent body which sets up the standards and regulations for the accreditation of hospitals. The Charleston Hospital was a member of the American Hospital Association and was so accredited during the month of November, 1960; as such, it was provided with a copy of the Standards for Hospital Accreditation, which are Plaintiff's Exhibit 15. These same Standards control accreditation in all parts of the United States; they were in effect on a national basis. The Charleston Hospital had been first so accredited in December, 1959.

Wayne P. Annis, on cross examination by the plaintiff under Section 60 of the Civil Practice Act, testified that during November, 1960, he was the administrator of the Charleston Hospital and that it had received a copy of the Standards for Hospital Accreditation, plaintiff's Exhibit 15, before that time. Plaintiff's Exhibit 5, the By-Laws of the Medical Staff, were then in effect; and Annis was familiar with the Regulations of the Department of Public Health, contained

in Plaintiff's Exhibit 8. Those Standards and Regulations had to be met and conformed to in order to be licensed and accredited. The hospital administrator supervised the various divisions of hospital service. He was the representative of the Board. He had a right to examine the nurse or hospital records on any patient.

The Hospital Administrator stated that no laboratory or other tests were made of the plaintiff while a patient to determine micro-organisms or whether or not a process of necrosis was going on in his leg,— the Hospital had no such procedure. On behalf of the hospital, Annis had made, sometime before trial, an investigation to determine how the cast had been applied. He had then answered an interrogatory of the plaintiff before trial as follows:

> "So far as this defendant knows, Dr. Alexander did not apply any gauze, dressing or padding to the leg before the cast was applied . . . ."

At no time had he recommended to the parents of the plaintiff that special nurses be employed. He kept acquainted with the case pretty generally. The nurses reported to him on a daily basis the developments. The nursing director reported to him the generalities of the condition of the patient. He said he was kept well informed of the progress of the situation. He knew the patient was a problem. He considered a comminuted fracture of both bones of the lower leg requiring closed reduction, as a minor orthopedic procedure in which there should be no complications if properly handled by the hospital and doctor. The nurses did tell him that the patient was experiencing a great deal of pain in the leg; they did not tell him that there was a foul odor in the room, or that the foot had become cold on November 7th. He was not told of the large blisters on the foot, or that the skin

of the foot had turned black and blue within 24 or 36 hours. At first he could not say whether the cutting of the plaintiff's leg, when the cast was split, had been reported to him, though later he stated that he was told that the leg had been cut by the hospital's Stryker saw. There was no protective device on the saw by which the depth of the cut could be regulated. The nurse who assisted in splitting the cast was a hospital employee.

Rex Darling, Jr., the injured plaintiff's cousin, a plaintiff's witness, noticed blisters form on the toes and foot which protruded from the cast and called the presence of such blisters to the doctor's and nurses' attention. The heat cradle was in place over the leg until late Sunday night following. On Monday, the foot was hard, waxy, and stiff to the touch. The pain continued; the patient was in constant pain. The patient felt nothing Monday night when Rex Jr. pinched his toes. Rex Jr. told the Doctor the condition of the toes he'd noticed. After the cast was split the lower part of the cast was stained and soggy, wet to the touch. There was a great amount of drainage in the leg. Starting around Wednesday, after the injury, there was a definite smell in the room that got worse— a "rather putrid stench." The pain was so bad that the plaintiff kept grabbing the sides of the bed and kept asking for medicine. He was very restless. The nurses would tell him to be quiet on occasion.

Kenneth Darling, the plaintiff's father, a witness for the plaintiff, testified that his son had some difficulty recognizing him at first. At that time, Saturday evening, there was a heat cradle on the leg and it was still there Sunday evening when the father left. Tuesday evening, Mr. Darling talked on the telephone to a nurse who said: "she came very near to calling you today because Pat (the plaintiff) was in such terrific pain." Later in the week, Friday, Saturday,

and Sunday, there was seepage around the cast, which seepage extended out over the pillow—some medicine, and some blood. There was a very noticeable "terrifically foul stench" in the room. The foot was swollen and part was a grayish-blue. One of the nurses also commented to Mr. Darling on the odor. The patient would writhe and his face would grimace with pain; he would grab the edge of the bed and hold on in attempting to relieve the pain. Wednesday of the second week when the father was there again the seepage continued and it was "a really foul odor in the room." The second weekend, he was removed to Barnes Hospital. At that time Pat still had quite a lot of pain and there was "this terrible odor." Dr. Reynolds tried to save the leg by successive strippings of dead tissue. The father saw some of this the day after admittance to Barnes Hospital. The limb was "real dark, decomposed condition of decay." When, however, tissue had been lost to the extent shown by the Plaintiff's Exhibit 1, taken January 23, 1961, it was considered better to remove the leg, and that was done. An artificial limb was subsequently obtained.

Rex Darling, basketball coach at the University, who was the injured plaintiff's uncle, testifying for the plaintiff, said he saw the plaintiff almost daily. He saw discoloration of the injured tissue, seepage in the cast, and an odor like decaying flesh from the leg which he said he had not smelled since World War II. Around Thursday of the first week he noticed and discussed this odor with the nurses. One nurse told him this was a normal cast odor. Rex told her that it was not, that he had a good deal of experience from sports with casts, and that this smell was completely different. He did not notice any abating of the patient's pain.

Anna Myers, called by the plaintiff, testified that she was a Registered Nurse at the hospital and was medication nurse and relief supervisor when the plaintiff was there. She thinks the foot was swollen. She observed blisters. The references in the Nurses' Notes on November 6 and 7 that the foot was "very edematous" meant that it was very swollen; on the 7th there is an entry "very edematous and dark"; the entries as to it being "cyanotic" meant that it was bluish in color; she recalled the situation prompting the entry "foul odor"—it didn't "smell good." At the trial she said she had talked to Dr. Alexander about her observations as to pain, odor, or color of the foot. In a pretrial deposition she had testified she had not so talked with him.

Joy Schelling visited the plaintiff in the hospital Sunday, Tuesday, and Thursday following his injury. As a witness for the plaintiff, she said, Sunday, he was in a great deal of pain and sweating excessively. Tuesday, he did not recall her having been there on Sunday. At that time, she noticed blisters on his right foot. Thursday, Joy observed a smell in the room which seemed like "burnt flesh." Tuesday of the second week she observed the leg where the cast had been opened and, as an art student, observed that the leg was rough, hard, tight, and of a grayish-purple color. His face was contorted with pain and the cast was soaked with drainage. The odor was more intense the second week.

Albert Fisher, a plaintiff's witness, observed Tuesday after the injury where the leg and the cast had been cut, with drainage into the cast. The patient was in great pain. Fisher observed a strong odor Thursday after the injury and more intensely in the second week, which, as a zoology student, he stated was similar to that encountered when he cut open animals which had been dead for a long time.

Marjorie Darling, the plaintiff's mother, testified for the plaintiff that he was in great pain at the hospital; that since the injury his disposition and personality had greatly changed. Where he was formerly easy-going and considerate, he was now sharp-tempered. The stump is tender and forms blisters which break, with puss and blood getting into the stump socks which she observes in washing them. Because of this soreness, he often cannot wear the artificial leg. She saw the upper part of the cast, which had been removed, taken out of a cabinet in the room and put back on top of the leg just before the plaintiff left Charleston Hospital.

The plaintiff himself testified that he was in a good deal of pain at the Charleston Hospital. He remembered Dr. Alexander splitting the cast Tuesday of the first week, and, in that process, cutting him on one side of his leg. When he protested, one of the nurses gave him a hypo, and he didn't remember anything more. The next morning when they changed the bedding, the underside of the pillow on which the leg rested was full of blood. He stated that when he was taken to Barnes Hospital, Dr. Reynolds, from November 19 to February 23, kept stripping away dead skin and flesh. Sometimes he was under no anesthetic, and there was no sensation. The leg was then amputated. The stump is still very tender and forms blisters. He has had to give up all of his recreational activities, including athletics. There are phantom pains which feel as if the foot is still there and like someone is sticking it with a pin; at other times, the missing foot will seem to itch.

Dr. Fred C. Reynolds, for the plaintiff, testified that he was director of the Orthopedic Clinic at the Barnes Hospital Group and head of the Orthopedic Surgery section at Washington University School of Medicine; and that he is president of the American

Board of Orthopedic Surgeons. Dr. Reynolds described the plaintiff's medical history and appearance. When he first saw the patient, November 19, 1960, there was dark discoloration on the top of the foot and front of the ankle, some blisters on the foot and ankle, the foot was swollen, there was inability to move the toes, loss of feeling on the top of the foot, a slight nick on the side of the leg, and a 3 inch laceration on the other side of the leg. The reduction of the fracture, by the X-rays, was excellent. The dark skin was in an area which had lost vitality, in all probability from interference of circulation. The blisters came from swelling after an injury where there is a large amount of hemorrhage or edema. He thought there was an interference of circulation to some of the muscles, so they did not have nutrition—an ischemic necrosis of the muscles,—a Volkman's paralysis or ischemia. It was not at first possible to tell how extensive this was and he recommended waiting awhile and try to continue treating without surgery. On November 23rd the wound was incised and inspected, there was drainage, but no dead tissue was removed at that time. On November 26th the leg was opened more extensively, some dead, necrotic muscles and tendons were removed, the wound packed, and a plaster splint applied. Necrosis means dead. Later a metal screw and wire suture were placed to give some fixation to the fracture. Dr. Reynolds wanted to try to save some usefulness of the leg, if possible, and he continued to remove portions of dead tissue, muscle, and tendons up to January 23, when the leg was amputated about 8 inches below the knee. The death of this tissue was "due to interference of circulation to the muscles." In his opinion, "the circulatory impairment in this instance was the result of compression of the circulation by swelling or hemorrhage or both, which was maintained or constricted by a plaster cast." As to the cutting of the leg in splitting

290

the cast "that tipped the scale and tied our hands," since there was dead tissue complicated by infection in these cuts. Before amputating the leg, a photograph, which is the plaintiff's Exhibit 1, was taken which, Dr. Reynolds testified, correctly showed the appearance of the leg at that time, making the amputation necessary. He identified the medical text books, later referred to, as recognized, orthodox texts. The changes in appearance a doctor must be alert for in such a case are swelling, discoloration, loss of feeling, and coldness, and the presence of pain is probably one of the most significant indications of interference of circulation under a cast. If there is pain, swelling, and a dark color of the foot an interference of circulation is indicated. The cast should be split and the leg elevated. At some time between 6 and 24 hours after circulation has been impaired to muscles the point of no return is passed, i. e., the condition is irreversible, and the muscles cannot survive if circulation is restored following such period of time.

Nurse Director Patricia Jenkins testified for the defendant that the Stryker saw which cut the leg when the cast was removed—an electric saw,—was owned by the hospital. The nurses and the orderly who assisted in applying the cast, and in cutting the cast, were hospital employees. She also testified, as of the time the cast was first applied: "At that time it would be expected that he did have excessively traumatized soft tissue of the lower right leg because of the type of fracture. Blisters developed. Of my own knowledge I could not answer whether any step was taken to sterilize the skin before the cast was applied."

In its answers to the plaintiff's interrogatories before trial, the hospital had answered that no "sterilizer or disinfectant was applied." The doctor also said the leg was not washed or sterilized.

291

Lelia Carroll, a witness for the defendant, testified that on November 5, 1960, she was a practical nurse employed by defendant. On that date she, an orderly named Steve Goodson, and a nurse, Vera Bezruki, helped Dr. Alexander apply the cast to Pat's leg. The leg was not shaved. No sterilizer or disinfectant was applied.

Madeline Snoddy was the medicine nurse. As a witness for the defendant she remembered Rex Darling, Jr. asking for pain medicine for the plaintiff numerous times. From her own observations, he was in pain. She reported her observations about the pain to the supervisor.

Vera Bezruki was a practical nurse employed by the defendant who helped apply the cast. She testified for the defendant that she did not tell either Dr. Alexander or Dr. Swickard "about the foul order I noticed in the room." She reported it to her supervisor.

Dr. Alexander testified for the defendant that he was engaged in general practice, graduating from the University of Illinois in 1927, and being licensed in 1929, after an interneship in Chicago. On November 5, 1960, "there was a type of emergency service arranged at the hospital so that when an emergency arose, there was a doctor to be called. . . . I was on emergency service on November 5, 1960." He received a call to come to the hospital that afternoon and went to the emergency room.

Dr. Alexander testified that he put muslin on the leg part way up before applying the cast, and the muslin was left under the cast, except the muslin was cut off the foot. He reiterated later that he had padded the leg, at least in part. The hospital had answered an interrogatory before trial as follows:

292

"Interrogatory No. 7.

'What type of gauze, dressing or padding was applied to the injured leg before the cast was applied? . . .

Answer: So far as this defendant knows, Dr. Alexander did no apply any gauze, dressing or padding to the leg before the cast was applied. . . .' "

Dr. Alexander had testified on a deposition, as to the cast application, a year before trial, as follows:

"Q. Was it in direct contact with the skin?
A. Yes. . . .
Q. After the cast had been wrapped, what did you do with the gauze Goodson was holding on to?
A. Cut it.
Q. Then was it pulled out?
A. Cut and pulled out . . ."

The doctor also testified that he saw no wadding available at the time he applied the cast. After November 5, the doctor observed blisters on the foot; the foot and leg were both swollen and edematous; and the foot was dark. Pain was present, and eleven separate pain medications were given on November 8. The leg was cut in removing the cast and there was some blood. At no time did he ever request any consultation by another doctor nor was any consultation ever suggested by the hospital. He said it was possible to immobilize a broken leg by splints, sand bags, or traction. If there was no cast on the leg it could not constrict it. When he first saw the plaintiff there was already present so much soft tissue swelling he did not think there could be any more swelling. None of the hospital employees present when the cast was applied objected to the doctor's procedure. He said if infection were present, and the tissue was swollen,

and the flesh constricted by the cast, that could be a source of intense pain. Where there is a constriction of soft tissue he did not think it necessary to check the toes for circulation every 10 or 15 minutes, despite a suggestion in Watson-Jones' work. When temperature is lost in a foot he'd say the damage becomes irreversible within 12 hours; if the temperature in the foot is completely gone it is too late after 4 hours to change. He said the application of heat will sometimes increase circulation and that sometimes increases swelling. He did not agree with excerpts from the works of Colonna, Thorek, and Compere warning against unpadded skin tight plaster casts in treating fresh fractures.

Dr. Alexander had testified that he had set between 200 and 300 legs during his period of practice. Upon cross-examination, he was requested to name any patient whose leg he had set during the three years from 1957, when this hospital had opened, until the date of the plaintiff's hospitalization in 1960. The hospital records were produced for him to refresh his recollection. It turned out that the only fracture cases he had set personally were two ankle injuries, and one of these resulted in a nonunion.

Dr. Alexander admitted that he could not recall what textbooks on orthopedic procedures he had studied in medical school before graduating in 1927. He could not recall the names of any books on orthopedic procedures he had studied in the last ten years to update his major orthopedic procedures. He was not familiar with Watson-Jones "Fractures and Joint Injuries," or Key and Conwell's "Fractures, Dislocations, and Sprains." During the entire period he was on the hospital staff he had never been examined orally or in writing by the board, administrator, or medical staff concerning procedures in the treatment of fractures. He had finished his formal medical

school studies in 1927. He admitted that medicine had not stood still since then. He acknowledged that important changes and improvements had occurred since then, and some improvements had been made since then in the treatment of broken bones.

Wayne Annis, the Hospital Administrator, examined by the plaintiff under section 60 of the Civil Practice Act, testified:

> "As the Board's representative, I did nothing to see that Dr. Alexander reviewed his operating techniques for the handling of broken bones. So far as I know, Dr. Alexander may not have reviewed his operating techniques since he was first licensed to practice in 1928. No examinations were ever given. I never asked questions of the doctor about this matter. The governing board, neither through me nor through any other designated administrative representative, ever checked up on the ability of Dr. Alexander as compared by medical text books. I had access at the hospital to some good orthopedic books . . . . Other than buying these books, I never made any effort to see that Dr. Alexander, or any other physician admitted to practice more than thirty years ago, read them";

that in November, 1960, the consulting staff included two Board Certified orthopedic surgeons, Dr. Ross and Dr. Petersen, who had frequently performed or assisted in orthopedic surgery in the Charleston Hospital. However, Annis did not ask either of them, nor did he ask Dr. Swickard, head of the Hospital medical staff, to look in on this case. Nor did any other hospital officer, employee, or representative request Dr. Alexander to consult with any other physician. Mr. Annis said for example, that he would not permit any member of his active medical staff to perform

brain surgery and would stop them if they attempted to do so.

Dr. Martin Koeck testified for the plaintiff that he is a general practitioner, licensed in 1948, and practicing about thirty miles north of Charleston, in a small community. General practitioners, he testified, as well as specialists, refer to standard orthopedic texts to keep abreast of modern techniques in surgical and fracture treatment. Such orthodox medical works include: Watson-Jones, Fractures and Joint Injuries; Key and Conwell, Fractures, Dislocations and Sprains; Colonna, Principles of Orthopedic Surgery; Depalma, Management of Fractures and Dislocations; Compere and Banks, Pictorial Handbook of Fracture Treatment; Thorek, Surgical Errors and Safeguards. He refers to them in his practice.

Dr. Clinton D. Swickard, Chief of the Hospital Medical Staff, testifying as a plaintiff's witness, stated that he was never consulted about the case and that neither Mr. Annis, nor any other hospital representative, ever brought the case to his attention. To his knowledge, no member of the medical staff consulted with Dr. Alexander about it. Consultation normally would be at the doctor's request. Upon different and earlier occasions, however, Dr. Swickard had been called in by a nurse in an emergency situation at the Charleston Hospital to see a patient of another doctor, where difficulty was experienced. He had handled setting of broken bones since 1916, most of the time in this County, and he was familiar with the usual, orthodox practices in handling such in the County, and he followed such practices. He further stated that there is always a great deal of soft tissue injury around any fracture which causes considerable swelling, which swelling continues usually for several hours, and which usually would be all gone in three days. A change in color of the toes or foot or loss

296

of temperature signifies circulatory impairment, requiring the cast to be loosened to relieve the impairment. Where swelling in the toes persists it is good practice to cut the cast. Complaints of pain persistently in a freshly cast limb are a sign of danger and should not be masked by drugs. A change in color is frequently the first sign of impairment—to some extent he'd loosen the cast then. If the foot loses temperature, he'd loosen it more. After such a change of color a period of 24 hours might or might not produce irreversible damage. If it becomes irreversible that is the point of no return—one cannot then help the circulation. There are quick and extra quick drying plasters available. He does not use any artificial implement for drying plaster—just air contact—though some members of the Hospital medical staff do and he does not feel it is bad practice. But after a cast is dry there is no medical purpose for further maintaining a heat cradle. He said physicians keep up their orthopedic techniques by, inter alia, reading authoritative publications which include "those which are in front of you"—all of which books were available to the staff in November, 1960, at the Hospital. Those were the books named by Dr. Koeck.

Dr. Mack Hollowell, for the defense, of the medical staff of the Hospital, in response to a hypothetical question, said the patient needed, when brought in, immediate medical attention, and needed the treatment given before the father signed the permit, and the methods used by the nurses to notify the doctor of complaints of pain, swelling, and otherwise, were proper. He said Dr. Alexander was qualified to reduce broken bones in the lower leg. He thought the blisters were the result of the fracture which injured the return circulation. It was usual and customary practice for a male orderly to help apply traction during the reduction, to elevate the leg on pillows,

297

to give the medications given, and the partial cutting of the cast Novemer 6th, and the splitting of the cast November 8th. He thought the application of the cast here was done properly. Splitting a cast causes loss of ability to hold the fracture in position. He thought the cast was here split as it should have been. He was asked regarding the above medical works maintained by the hospital. The procedures described by Watson-Jones and DePalma have become "a part of my general understanding and knowledge. All of those things have entered into my background understanding and knowledge which forms the basis on which I gave the answers to you today." The witness also brought along a text by Bancroft and Marble, and read excerpts from a chapter by Ralph Carothers. References to the text books were made in the cross-examination.

Neither Dr. Swickard nor his partner Dr. Hollowell, use unpadded plaster casts. Dr. Hollowell stated that unpadded plaster casts may be very dangerous, and "If a plaster cast is applied immediately after a fresh injury where soft tissue swelling is to be expected, one of the fundamental rules is the cast should immediately be split." There are many other ways, he said, of immobilizing broken legs without using plaster, such as traction, or open reduction, or external fixation. If there is persistent pain under a cast, it must be split; it is one of the important signals of danger. One of the last things to do, he said, is to cover up pain so one does not have that warning. If the toes are swollen. or discolored, or temperature is lost in the toes, steps must be taken. The toes should be tested every fifteen to thirty minutes for a quick return of blood and voluntary movement. He said one text writer said to use unpadded casts because such more adequately holds the fracture, and Dr. Hollowell thought that technique acceptable if

298

properly handled. He said he'd not wait three days to split a cast where there was persistent pain, the toes turned blue or cyanotic, were swollen, and turned cold. He agreed that it was the responsibility of a Hospital Board to limit a physician's work in the hospital to areas in which he is competent.

Anthony J. Perry, Hospital Administrator for the Decatur-Macon County Hospital, Decatur, Illinois, a witness for the defendant, testified in response to a hypothetical question that the nursing personnel at the hypothetical hospital was adequate and in conformity to standard practice in the area, the supervisory personnel were adequate, the laboratory tests available were customary, the laboratory personnel, based on their AMT ratings, were adequate, monthly meetings of the executive committee and medical records committee of the medical staff were customary, the appointment to the medical staff of a doctor in practice since 1928 was customary practice, it was the responsibility of the attending physician, in conformance with rules of the medical staff, to call in specialists or staff consultants, and using a male orderly to apply traction under a doctor's directions is customary. He belonged to the American College of Hospital Administrators. He was given by it a Code of Ethics to be framed and this now hangs on the wall of his office. This Code of Ethics codifies certain principles utilized in hospital administration and provides, in part, as follows:

> "Paragraph 3. The medical staff should be properly organized. Only qualified doctors of medicine, legally licensed to practice in that state, or surgeons, should be admitted to membership.
>
> Paragraph 4. It is the responsibility of the medical staff and of the governing board of the hospital to safeguard the interest of the public so

that no members of the medical staff or other practitioner shall be permitted to undertake any procedure for which he is not fully competent. Reluctance to interfere, pecuniary gain, must never be permitted to jeopardize the welfare of the patient or reputation of the hospital. For the protection of the patient in all serious or doubtful cases, there should be adequate consultation. . . .

Paragraph 12. It is the responsibility of all who have anything whatsoever to do with the care of the patient to make every effort to insure that all patients receive the best possible care with minimum delay, with the utmost of skill and efficiency, and with the greatest personal consideration and tenderness. . . .

Paragraph 21. The relationship of the administrator to the medical staff should be one of sympathetic understanding and helpful cooperation. The administrator should endeavor to have medical problems adjusted by the medical staff or its committees as necessity demands. However, the administrator, as a representative of the board of trustees, must act with decision and with firmness consistent with the welfare of the patients and continued good reputation of the hospital."

He subscribed to those views as to hospital administrator practices. He had studied at Northwestern University under Dr. MacEachern, an outstanding authority in the field of hospital administration, and was familiar with Dr. MacEachern's book. On cross examination parts of that book were referred to and Mr. Perry generally agreed therewith. He said a hospital is more than just bricks and mortar. It includes a laboratory, nursing staff, and medical staff, all of which must be kept up to certain standards in order to be licensed and accredited. He agreed, for example, with

300

Dr. MacEachern's statements that the governing board of the Hospital is responsible for the proper care of the patient, and the administrator, as the representative of the governing board, must assume this responsibility—while the board cannot originate or implement medical policy it is in the last analysis responsible for it—while it is not competent to judge the professional care of a patient the board is, nevertheless, liable for dereliction of duties established by law—it has power to choose the standard of medicine that will be practiced in its hospital—and general practitioners may be permitted to practice at a hospital, but within the area of their competency.

Dr. Lowell R. Montemayor, a general practitioner, of the Medical Staff of the Hospital, testifying for the defendant, in response to an hypothetical question, said it is customary for a male orderly to help apply traction to reduce a fracture, the blisters were due to the fracture itself, it is customary to apply a cast as soon as possible after a fracture, to immobilize the bones, the physician used the usual skill in reducing the fracture, elevating the leg on pillows was customary, the medications were customary, if the cast was cut on top it was customary, Dr. Alexander was qualified to treat fractures of this kind, the nursing staff of the hospital was skillful in the care of post operative patients, and the laboratory tests were usual and customary. He familiarized himself with the handling of orthopedic cases through medical school interneship and residency and by reading books in that field. "We have some references we use regularly and can consult at the time of injury to refresh our memory and gain more knowledge." These include the books on the table, DePalma and Watson-Jones. The reading of such works and other standard authorities in the "orthopedic field have gone into the makeup of my background and understanding of those cases. It is

301

necessary," he said, "to keep a vigilant watch to see whether circulation is impaired in cases where a plaster cast is applied." Also, if the foot were cold to the touch, discolored, dusky, and edematous, he would probably split it "right then." Where one has a constricting cast, with swelling of the toes, and discoloration, he stated, one knows one has a circulatory impairment, and if the patient is complaining of pain, one would split the cast, he said, promptly. When you have a lower leg fracture, and excessive soft tissue injury, swelling will normally continue for at least 24 to 36 hours.

Dr. Wayne Neal, a general practitioner in Coles County, though not a member of the Medical Staff of this hospital, for the defendant, in response to an hypothetical question expressed most of the same opinions as Dr. Montemayor. He testified that physicians study at accredited medical schools which have to meet certain standards which are set up nationally. The textbooks recognized in the field of medicine are pretty well standardized throughout the country, and the standards of practice are pretty uniform throughout the nation except for specialists. He testified that if an unpadded plaster cast is applied within 3 hours of an injury, and the toes swell within 2 hours of the cast application, and blisters form in less than 24 hours from the cast application, and within 36 hours from the cast application the foot is very edematous and dark, the cast should be split vertically. Where there is edema, one should check every ten or fifteen minutes to see if the color returns when the toes are pinched. It is quite important to keep a constant watch or surveillance.

Dr. Charles Ramsey, a member of the medical staff at the hospital, on behalf of the defendant, also expressed most of the same opinions as Dr. Montemayor. As to the attending physician's waiting to split

the cast, when there was some evidence of some impairment of circulation, he testified: "As a member of the hospital staff, I do know that in Pat Darling's case it went beyond the point of no return and he lost his leg." He was then asked:

"Q. If there was a situation of danger, where it is obvious that the patient will lose his life or limb, don't you concede, as you sit there, that the nursing staff should inform the chief of the medical staff?
A. Yes."

Dr. John Belting, a general practitioner, and a member of the Medical Staff of the Hospital, and of the Medical Records Committee of the Staff, a witness for the defendant, said the Records Committee meets monthly, and when he initialed or signed the record as to the plaintiff he approved the whole record, the diagnosis, treatment, and history. He expressed about the same opinions as Dr. Montemayor. He said he was out of sympathy with the plaintiff's side of the case. He did not know any author in the field of orthopedic procedure who states the best medical practice is to put on a skin tight plaster cast within 3 hours of a fresh fracture. From looking at the plaintiff's record he would say the toes in this case had not been pinched at 15 minute intervals to observe the return of blood or color to the skin.

Dr. Malachi Topping, an orthopedic surgeon from Terre Haute, Indiana, a member of the consulting Medical Staff of the Charleston Hospital, said, for the defendant, that he had worked with Dr. Alexander on certain cases, and he was qualified to handle a closed reduction of a fracture of a leg. He said "Volkmann's ischemic contraction" is a complication which may arise from a fracture, where there is soft tissue injury, producing a kinking or pressure or spasm in

303

the blood vessels in the region, partially or completely shutting off blood flow at that point to the extremity below. The more violence producing the fracture the more chance there is of soft tissue injury. Volkmann's ischemic contracture is found more frequently with comminuted fractures. Blisters are a common occurrence in about all fractures. The primary symptom of Volkmann's ischemic contracture is pain, then diminution in sensation, loss of sensation, and loss of motion. He thought Volkmann's ischemic contracture probably caused the symptoms indicated in the hypothetical question put to him, and nothing done or omitted to be done by the doctor or hospital contributed to cause the Volkmann's ischemic contracture. In his library he has Watson-Jones etc., Key and Conwell etc., DePalma etc., and other works relating to orthopedics. They are authoritative as a group. They aid in forming his opinions. Their teachings have gone into his general knowledge and help make up his opinions. Dr. Compere is highly qualified. Colonna is authoritative. Volkmann's ischemic contracture, when originally described, as referred to in Colonna, was referred to as being the result of the treatment of a fracture with splints or dressings that were too tight. It was not originally referred to as a result of the fracture itself. But some opinions, he said, have since changed as to the cause of Volkmann's ischemia. He thinks the ischemia is the result of the fracture, not of a too tight cast. Necrosis of the skin may develop if a skin tight plaster cast is applied after an injury where there is excessive soft tissue swelling unless the cast is split. Possible circulatory impairment is checked on by the presence or absence of swelling, the patient's color, pulse, temperature, pain, restlessness, ability to move the toes, etc. Pressure sores can develop under a cast, which may cause necrosis or death of tissue, the symptoms thereof being pain, until

the tissue is completely dead. A combination of pain and restlessness would lead him to suspect something was wrong. Pressing the nail of the toe to see if it blanches and color returns is an orthodox test for circulation. Dr. Topping agreed with Watson-Jones, a highly respected author, that an unpadded plaster cast on a fracture within a short time of injury and before reactionary swelling has occurred is dangerous, and a too tight cast may cause ischemic contracture, or even gangrene. He has seen patients who've had obstruction to arterial blood in a leg from a too tight cast, and it is possible.

The parents of the plaintiff were under the impression, erroneously, that Dr. Ross, a Board Certified orthopedist, was a consultant on the case. This was brought out in the first instance by the defense in cross-examining the plaintiff's father:

"Q. Are you acquainted with Dr. Walter Petersen from Champaign?

A. No, I am not.

Q. You did have a telephone conversation with him on one occasion?

A. No, I did not. That was Dr. Ross.

Q. You later learned it was Dr. Ross?

A. Yes.

Q. Can you tell the Court and jury about when that telephone conversation was?

A. That was in the morning between eleven-thirty and twelve, when I called Champaign on November 19th. I wanted to get authorization from Dr. Ross as to Pat's removal also.

Q. And you talked to Dr. Ross about your son's case. Is that right?

A. Yes, sir.

Q. At that time, Mr. Darling, did you think he had been consulted about it?

A. I assumed he had and found out differently."

305

There was no testimony by the nurses of ever checking the toes for blanching and return of blood, or for voluntary motion, either at fifteen minute intervals or at other intervals. Although there were three nursing supervisors, only one, Doris Potts, the evening supervisor, a witness for the defendant, testified that she ever had any communication with Dr. Alexander concerning the condition of the patient, and she did not report anything to the Chief of the Medical Staff or the Hospital Administrator. Mrs. Potts did not recall any foul smell in the room or any blood on the cast or pillows.

The plaintiff's medical bills are in the record with the present and recurring expenses being described separately by Mrs. Darling. The plaintiff's father is the Superintendent of Schools at Collinsville and familiar with the rates of pay in the teaching-coaching field for which the plaintiff was preparing and he testified about those. A teacher in that area, with an A.B. degree, and no experience, received $4900 per year. A teacher with an M.A. degree, and no experience, would receive $5400 per year. Above the straight teaching schedule, a teacher is paid $1000 a year for coaching basketball, $850 a year for football, $500 each for baseball and track, $250 each for tennis and golf, with an additional $500 for the post of athletic director. A teacher-coach may handle two teams. The above rates are representative and average only; many schools pay better. The plaintiff had high school letters in four major sports, had assisted in coaching during the summers, and was taking a course in education and coaching, with the objective of going into teaching and coaching. His athletic letters are in evidence. A photograph of the plaintiff in an athletic uniform is in evidence.

The defendant's theory, alternatively, is that the complaint, after the amendments at the close of the

plaintiff's evidence, did not state a cause of action and the defendant's motion to dismiss or its post trial motion for arrest of judgment should have been allowed; all the competent evidence, with its intendments most favorable to the plaintiff, fails to make a prima facie case against the defendant and the Court should have directed a verdict in favor of the defendant or entered a judgment for the defendant notwithstanding the verdict; the court should have remitted the amount, $10,000, of the verdict in excess of the defendant's liability insurance policy limits, namely, $100,000; and the court erred in rulings on evidence and instructions and the plaintiff's counsel abused the privilege of argument, whereby the defendant's motions for mistrial or new trial should have been allowed.

The plaintiff's theory is that the defendant hospital corporation, which held itself out to the public as a licensed and accredited hospital, was held to the standards imposed by law, by public regulation, and by self-regulation upon such institutions; it could not operate as a hospital merely by owning a building; it had to maintain certain departments, such as nursing, laboratory, medical, and surgical, and it was required to maintain certain standards applicable to each of them; whether the defendant did so in this case, or not, became a question of fact upon which the evidence was overwhelming in favor of the plaintiff; the verdict is amply supported by the evidence; and there was no error unless of a trivial character.

The defendant says in its brief—there are three areas, in successive alternatives, in which it is entitled to relief: (1) the pleadings, where the defendant's motion to dismiss the amended complaint, as amended, and its post-trial motion for arrest of judgment should have been allowed, (2) the insufficiency of the evidence to make a prima facie case, whereby

the court should have allowed the defendant's motions for directed verdict at the close of the plaintiff's evidence, or at the close of all the evidence, or its motion for judgment notwithstanding the verdict, or the court should have remitted the amount of the verdict in excess of the liability insurance policy limits, $100,000, and (3) the conduct of the trial, where the court erred in various rulings upon the admissibility of evidence, the jury instructions, and the plaintiff's argument to the jury, whereby the court should have allowed its motions for mistrial or new trial. We shall follow, substantially, the order in which matters are presented in the defendant's argument, bearing in mind that the points and authorities part of the defendant's brief is intended to consist of the propositions relied upon in support of the appeal, the argument part thereof is intended to be limited to the points made in the points and authorities, that a point made but not argued may be considered waived—Appellate Court Rule 7—and that we will not search the record for error.

The defendant urges that by reason of the court allowing the last amendments to the complaint at the close of the plaintiff's evidence it did not state a cause of action; the obligation of the defendant hospital is definitive and only requires it to comply with the usual and customary standards when medical care is involved; the plaintiff changed the theory of his action by thus amending paragraph 4 of the complaint at the trial, which amendments recasted his allegations so as to make a separate and distinct issue not previously involved in his complaint; the recasting in effect charged the defendant with an unequivocal duty to comply with each and every suggestion and recommendation of the Joint Commission on Accreditation of Hospitals and the Rules and Regulations of the Department of Health of the State of Illinois;

308

and the defendant by virtue of these amendments at the trial was taken by surprise and was deprived of the means to explore this channel of possible defensive evidence.

With regard to the pleadings, the defendant argues that the sole duty of the hospital was to provide care on the basis of such care as is furnished by other hospitals in the area involved or in the general area involved at the time, and cites as representative cases: Olander v. Johnson (1930), 258 Ill App 89; Simmons v. South Shore Hospital (1950), 340 Ill App 153, 91 NE2d 135; Bradshaw v. Iowa Methodist Hospital (Iowa, 1960), 101 NW2d 167; and Carrigan v. Roman Catholic Bishop (1962), 104 NH 73, 178 A2d 502.

To put in proper perspective the amendments at the close of the plaintiff's evidence to certain parts of paragraph 4 of the complaint, as theretofore amended, the first clause of paragraph 4 read prior to the amendments at the trial: "That the defendant corporation then owed to the said plaintiff a duty to use that degree of skill in the care of such patient as would be exercised by institutions of like kind and character in that county;" The amendment thereto at the trial deleted "as would be exercised by" and inserted in lieu thereof "required of," so that as so then amended that clause read "That the defendant corporation then owed to the said plaintiff a duty to use that degree of skill in the care of such patient required of institutions of like kind and character in that county." The next clause of that paragraph (which was not amended) alleged that in violation of its duties the defendant was guilty of one or more of the following negligent acts or omissions proximately causing injury to the plaintiff, following which are subparagraphs A-O. The first part of subparagraph "O" read prior to the amendments at the trial: "That the

defendant hospital failed to conform to and to observe one or more of the following standards customarily required of and adhered to by accredited hospitals in the area involved at that time:" The amendment thereto at the trial deleted "customarily required of and," so that as so then amended that part read "That the defendant hospital failed to conform to and to observe one or more of the following standards adhered to by accredited hospitals in the area involved at that time:". Those were the only amendments at the trial. Up to the point of those amendments at the trial the defendant had answered the complaint in its theretofore amended form and had not filed any motion to dismiss or strike to test its legal sufficiency. After those amendments were made at the trial the defendant moved to strike the complaint as so amended on the grounds there were no allegations to state a prima facie case, there were no grounds stated of any duty, or breach, or injury as a proximate result, and it shows the injuries were proximately caused by things other than the act or omission of the defendant, and it moved for a continuance.

■■■■ To state a cause of action a complaint should contain the necessary substantial averments of *fact*, and the statement of the alleged cause of action should be *plain and concise:* Ch 110 Ill Rev Stats 1963, §§ 31, 33. Averments in a complaint as to the *duty* of a defendant are mere conclusions of law and are not traversable; it is not sufficient to allege generally the duty of the defendant—the plaintiff must state alleged facts from which the law will raise a duty, and allege an omission of duty, and a resulting injury: Schueler v. Mueller (1901), 193 Ill 402, 61 NE 1044. An allegation of duty, as such, is surplusage—if the facts stated raise the duty the allegation is unnecessary—if they do not it is unavailing: Gibson v. Leonard (1890), 37 Ill App 344. And see: Altepeter v. Virgil State Bank

(1952), 345 Ill App 585, 104 NE2d 334; Trial Briefs, ISBA, May, 1964, Vol IX, No 11, P 811.

The first clause of paragraph 4—"That the defendant corporation then owed to the said plaintiff a duty" etc.,—was not a substantial averment of fact, but a conclusion of law and not traversable. It was surplusage. If the complaint plainly and concisely alleged sufficient facts from which the law will raise a duty, and an alleged omission of duty, and an alleged proximately resulting injury, it was sufficient as a matter of pleading. Being surplusage and not a necessary substantial averment of fact, the amendment thereof at the trial to delete "as would be exercised by" and insert in lieu thereof "required of" was not significant or material. As to the first part of subparagraph "O" —"That the defendant hospital failed to conform to," etc.,—the amendment thereof at the trial to delete "customarily required of and" hardly seems necessarily, as the defendant urges, to charge it with an unequivocal duty to comply with every recommendation of the Joint Commission and the Rules and Regulations of the Department, but rather seems to have removed some of the more stringent and somewhat mandatory type of language theretofore present therein.

The plaintiff urges that as a matter of law the defendant hospital had a duty to use that degree of skill in the care of the plaintiff required by institutions of like kind and character in that County, and that any standards, contractual provisions, or other regulations which set forth the nature of the acts to be performed by a party help to determine the duties which exist, and cites as representative: American Nat. Bank & Trust Co. v. Peoples Gas Light & Coke Co. (1963), 42 Ill App2d 163, 191 NE2d 628; Kleren v. Bowman (1957), 15 Ill App2d 148, 145 NE2d 810; O'Brien v. Musfeldt (1951), 345 Ill App 12, 102 NE2d 173, and

certain cases from other jurisdictions—Stone v. Proctor (1963), 259 NC 633, 131 SE2d 297, which cited 32 CJS 625; Wilson v. Lowe's Asheboro Hardware, Inc. (1963), 259 NC 660, 131 SE2d 501; and Favalora v. Aetna Casualty & Surety Co. (La 1962), 144 So2d 544.

In Judd v. Park Avenue Hospital, 37 Misc2d 614, 235 NYS2d 843, the Court said:

> "It appears that within reasonable limits the hospitals in a given community may themselves establish the standards of care applicable to them."

And in that case the Court indicated that a patient suing a hospital would be permitted to inspect, and make copies before trial of hospital bylaws, and rules and regulations, and, if approved by the Joint Commission on Accreditation of Hospitals, copies of bylaws and regulations adopted by the hospital, on the ground that the patient may be able to show that hospitals of the community had established reasonably uniform rules and regulations for the care of patients.

In Selden v. City of Sterling (1942), 316 Ill App 455, 45 NE2d 329, in referring to one of the rules adopted by the public hospital of the City of Sterling to the effect that no physician or surgeon shall perform a major operation in the hospital unless he is a member of the staff or has in attendance, prepared for assistance in the operation, one or more members of the staff of the hospital in addition to a proper anesthetist, the court had this to say:

> "The rules adopted by the board of directors are those of standard hospitals. The rules governing admission to membership on the staff apply to all physicians alike, and tend to maintain a high degree of skill and integrity in the membership. It is obvious that rules must be adopted to protect patients in major operations from unethical or

312

unskilled practitioners, even though they are licensed physicians. Anybody may be forced to undergo a major operation. The rule in controversy is fundamentally a provision for the public safety and the public welfare. . . ."

We have read the Illinois cases cited by the plaintiff and although not directly in point on the particular question, they have by implication held that liability may exist against a hospital, as pointed out inferentially in Wade v. Ravenswood Hospital Ass'n (1954), 3 Ill App2d 102, 120 NE2d 345, and Dayan v. Wood River Tp. Hospital (1958), 18 Ill App2d 263, 152 NE 2d 197.

After considering the arguments of the plaintiff and defendant, and the authorities relied on, we believe that conformity with the standard of care observed by other hospitals in good standing in the same community cannot necessarily in itself be availed of as a defense in a negligence action where the criterion relied upon is shown to constitute negligence, in that it fails to guard against injuries to the patient in the failure to meet standards of care self imposed or established. The duty of a hospital to a patient is measured by conditions as they then exist, and not by what they have been in the past or may be in the future. The duty of a hospital may not be fulfilled merely by utilizing the means at hand in the particular city where the hospital is located.

The defendant asserts that it was taken by surprise by the amendments at the trial. It appears that the plaintiff prior to trial had advised the defendant of the precise proposed exhibits covering Departmental rules and regulations, statutory provisions, bylaws, and accreditation standards, and it also appears that the defendant made no objection to the admission in evidence of any of those as exhibits. At any time before final judgment amendments may be

313

allowed on just and reasonable terms, in any matter, either of form or substance, in any pleading, which may enable the plaintiff to sustain the claim for which it was intended to be brought, or, before or after judgment, to conform the pleadings to the proofs, upon terms as to costs and continuance that may be just: ch 110, Ill Rev Stats 1963, § 46. And, as to the request for a continuance, on good cause shown, in the discretion of the Court and on just terms additional time may be granted for the doing of any act or the taking of any step or proceeding prior to judgment: ch 110, Ill Rev Stats, 1963, § 59. To the extent the Court had discretion as to the allowance of the amendments at the trial and as to the requested continuance we think there was no abuse of discretion.

 We believe that the complaint as last amended at the trial stated a cause of action, the amendments then made did not materially change the nature of the alleged cause of action, the defendant was not taken by surprise, and the Court properly overruled the motion to strike the complaint as so amended, properly denied the motion made at the trial for a continuance, and properly denied the post-trial motion for arrest of judgment.

On the sufficiency of the evidence to make a prima facie case, the second general area referred to by the defendant:

Having found the complaint, as amended, stated a cause of action, we have set out at length the substance of the evidence of the plaintiff and the defendant applying to the issue of the negligence, vel non, of the defendant hospital employees and on the liability of the hospital as failing, vel non, to meet the requirements of a licensed accredited hospital as set up by certain minimum standards imposed upon it by statute, Departmental Rules and Regulations, accreditation standards, and its own medical staff bylaws.

The defendant argues that the entire theory upon which the plaintiff's case was tried prostitutes the concept that a hospital's duty is to use reasonable care commensurate with the usual standards. And this argument is then followed with this in its brief:

> "Here the defendant (Charleston Community Memorial Hospital) proved what the usual and customary practices were. The testimony of qualified medical doctors and hospital administrators, beginning with the evidence of Doctor Mack Hollowell, was introduced. There was no evidence introduced by the plaintiff contravening this evidence. The apparent conclusion of the jury that the defendant Hospital did not follow the usual practices must be set aside, therefore, as a matter of law. . . . The plaintiff offered no evidence on usual and customary practices. The defendant did, referring to the case of Edwards v. Grace Hospital Soc., 36 Atl (2nd Conn) 273, just as did this defendant here."

This leads us to believe that the defendant Hospital's defense was predicated solely on what it considered to be the duty of the defendant Hospital to provide care on the basis of such care as is customarily furnished by other hospitals in the community involved or in the general area involved at the time. As we believe a cause of action exists, under the complaint, as amended, in the circumstances here, obviously the evidence of the plaintiff was fundamentally different in some respects than the evidence of the defendant.

The defendant did not seek to withdraw any of the particular charges in the complaint, as amended, from the jury's consideration. It submitted no special interrogatories on any particular phase of the matter. It did not object to any of the exhibits of the Departmental Rules and Regulations, the Standards for

Hospital Accreditation, or the Bylaws etc. of its own Medical Staff. As we shall see later, it did not object to plaintiff's given instructions 4a and 6a relating, respectively, to the Departmental Rules and Regulations and the Standards for Hospital Accreditation, and it, in fact, tendered the defendant's given instruction 23a relating to those matters. There is no merit, under the circumstances, in the contention that evidence is lacking in support of any of the charges. It cannot be said there is no competent evidence, with its intendments and inferences considered favorably to the plaintiff, in support of one or more of the alleged breaches of duty.

■ There was a question of fact for the jury to determine, (1) as to whether the defendant Charleston Community Memorial Hospital, being licensed and accredited, met the standards imposed upon it, and if it did not then whether it was negligent, and (2) as to whether the defendant's employees as such, and therefore it, were negligent in other respects charged, all as set forth in this complaint, as amended. There was evidence from which, if believed, the jury could properly find for the plaintiff, and we cannot say the verdict is clearly against the manifest weight of the evidence. Hence the defendant's motions for directed verdict and for judgment notwithstanding the verdict were properly denied, and the post-trial motion for new trial as to the verdict being contrary to the manifest weight of the evidence was correctly denied.

■ In its post-trial motion the defendant urges as one reason for a new trial that the voir dire examination of the prospective jurors was conducted improperly and erroneously and the jury misled because in the plaintiff's attorney's interrogation of original juror number 3 (Mrs. Woodyard) whom he later excused, he stated "Our case is based upon the negligence of the hospital," that the defendant objected, and that the Court overruled the objection. To that motion is

appended a supporting affidavit of one of the defendant's attorneys to the effect that no record of the voir dire examination was taken, and that the allegations of the motion are true and correct. The record before us does not show the entire examination of the prospective juror in question on her voir dire; in the absence of such showing we cannot review the alleged action of the Court in allegedly overruling an alleged defendant's objection to the alleged statement: Dille v. Eads (1959), 21 Ill App2d 301, 157 NE2d 813. The defendant has not properly preserved the alleged matter for review: McCormick v. Kopmann (1959), 23 Ill App2d 189, 161 NE2d 720.

 The defendant also presents in its post-trial motion as a reason for a new trial that the jury flagrantly flaunted their oath to try the case well, according to the evidence, and a true verdict render, because the jury remained in actual deliberation for only approximately 3 hours, or a little less, which was inadequate to consider the evidence. To that motion is appended another supporting affidavit of one of the bailiffs in attendance upon the jury to the effect the jury was in deliberation for approximately 3 hours, or a little less, before returning the verdict. Again, there is nothing in the record before us on this, there is nothing in that regard for us to review, and the defendant has not properly preserved anything as to this for review. The claimed significance of the matter urged is, moreover, not readily apparent.

 Next, the defendant complains of the overruling of its objections to a couple of questions of the plaintiff put to Wayne P. Annis, the Hospital Administrator of the defendant hospital, called by the plaintiff under section 60 of the Civil Practice Act, ch 110, Ill Rev Stats 1963, § 60, and to the sustaining of the plaintiff's objections to certain questions of the defendant put to that witness upon further examina-

317

tion following the plaintiff's cross examination. As we read the abstract, the plaintiff asked the witness, under section 60, whether rule 24 of the suggested Rules and Regulations for the medical staff of a hospital, plaintiff's Exhibit 17, being a part of or suggested by the Standards for Hospital Accreditation of the Joint Commission on Accreditation of Hospitals, plaintiff's Exhibit 15, provided that the operating surgeon "shall have a qualified physician assistant at all major operations." The witness answered "yes." Then the defendant's attorney objected to the question as not being material or relevant. This was overruled. Then the plaintiff asked the witness whether he did not consider orthopedic procedures among the most involved and difficult to manage of any surgical procedures performed in the hospital. The defendant objected thereto on the basis of no materiality. This was overruled. The witness answered that "orthopedic surgery" was too general a term for him to answer—some such procedures were major and some minor—"Where you have a comminuted fracture of both bones of the lower leg requiring closed reduction, as a hospital administrator I would consider that minor. There should be no complications in connection with it if properly handled by the hospital and doctor." This witness was being "examined as if under cross-examination," at the instance of the plaintiff, the adverse party. As to the first question, above, the witness having already answered "yes" before the defendant's objection, and there being no motion to strike the answer, the objection was too late. And, considering that this was cross-examination, the question was not immaterial or irrelevant in the light of the subject matter, and hence the stated basis of the objection was not sound. As to the second question, again, considering the nature of the examination and the subject matter, the question was not immaterial, and hence

318

the stated basis of the objection was not sound. Further, the witness' answer to the second question was such that it was almost no answer at all and can hardly be said to have been harmful or prejudicial to the defendant. The questions of the defendant put to that witness upon further examination following the plaintiff's cross-examination, to which objections of the plaintiff were sustained, and of which the defendant now complains, were, for example, where in the hospital records, of which plaintiff's exhibit 7 was a part, states that Dr. Alexander ordered a culture made; whether inspections were or were not conducted with regard to the hospital's being licensed prior to November, 1960; what did he, as Hospital Administrator, have to do with advising staff members to call in a specialist; what did he have to do with seeing that Dr. Alexander examined the hospital records and initialed or signed them; what did he have to do with reviewing with Dr. Alexander to determine his qualifications; and what did he have to do with seeing that the medical books in the hospital library were read or studied by the medical staff. In that further examination, following the plaintiff's cross-examination under section 60, the defendant might examine this witness as to matters tending to explain or qualify the testimony given on cross-examination, but not as to new matters not brought out on the cross-examination or as to matters constituting part of the defendant's defense; the scope of the further examination is largely in the discretion of the Trial Court, but it should not be so extended as to interject the defense into the plaintiff's case at that stage of the trial—the orderly procedure of a trial does not sanction that: Horner v. Bell (1949), 336 Ill App 581, 84 NE2d 672. The defendant's questions involved here were more properly related to matters constituting a part of the defendant's defense, rather than tending to explain or qualify the

319

testimony given on cross examination; some related to strictly negative evidentiary matters; some concerned merely the presence or absence of entries in hospital records which were already in evidence and from which the facts could be best ascertained; some were of doubtful materiality; and some were really questions of law rather than fact. There was no abuse of discretion in sustaining the objections thereto. The defendant had ample opportunity to call this witness as its own witness in chief as a part of its own evidence and interrogate him fully on any relevant matter without being subject to the inherent inhibitions present in trying to go into certain matters on this further examination following the plaintiff's cross examination under section 60. The defendant did not so call the witness in chief as a part of its own case.

 The plaintiff's exhibit 1 was a photograph of the plaintiff's lower right leg and foot, taken January 23, 1961, immediately prior to the amputation thereof by Dr. Fred C. Reynolds at Barnes Hospital, St. Louis. It was identified by Dr. Reynolds and by the plaintiff's father. The defendant objected thereto on the grounds there was no proximate relation between the defendant hospital and the photograph—no causal connection between the condition indicated in the photograph of January 23, 1961 and the defendant hospital—there were changes in the leg between November 19, 1960 when the plaintiff left the defendant hospital and January 23, 1961 which divorced any proximate connection between the defendant and the condition of the leg January 23, 1961 indicated in the photograph. The objections were overruled and the photograph admitted into evidence. The defendant argues the only purpose thereof was to inflame, impassion, and confuse the jury—it unduly emphasized the injury, and distracted the jury from the liability issue; there was already ample evidence of the condi-

tion; and there were changes in conditions between November 19, 1960 and January 23, 1961. If evidence of this type has a reasonable tendency to prove some material fact in issue, such evidence may properly be admitted, and the question is one properly within the discretion of the Trial Court; if a photograph is accurate, properly identified, and relevant, the mere fact it may have a tendency to prejudice the jury is not sufficient to justify its exclusion; it is a matter within the Court's discretion: Pitrowski etc. v. New York C. & St. L. R. Co. (1955), 6 Ill App2d 495, 128 NE2d 577. A reviewing court will examine the matter to determine whether the admission in evidence of a photograph was carefully considered by the Trial Court and whether in the light of the circumstances presented to the Court there was or was not an erroneous abuse of discretion: Ciskoski v. Michalsen (1958), 19 Ill App2d 327, 152 NE2d 479. Evidence having a natural tendency to establish the facts in controversy should be admitted; competent evidence may not be excluded merely because it might arouse feelings of horror or indignation in the jury; questions as to the character of the evidence offered, and the manner and extent of its presentation, are largely within the discretion of the Trial Court, and the exercise of that discretion will not be interfered with unless there has been an abuse to the prejudice of the defendant: People v. Jenko (1951), 410 Ill 478, 102 NE2d 783. A photograph of this type may be proper to give the jury a better understanding of the medical terminology in evidence and the demonstrative evidence which could not be completely expressed by the written or spoken word: People v. Donaldson (1956), 8 Ill2d 510, 134 NE2d 776. And see: People's Gas Light & Coke Co. v. Amphlett (1900), 93 Ill App 194; McNally v. Chauncy Body Corp. (1942), 315 Ill App 190, 42 NE 2d 853. Under all the facts and circumstances in evi-

dence we do not think it can be said there was no proximate relationship or no causal connection between the condition of the leg and foot indicated in the photograph January 23, 1961 and the events in evidence occurring, or not occurring, at the defendant hospital November 5–19, 1960; the jury was thoroughly informed of the events occurring after November 19th, and it was for them to determine the weight and significance thereof as well as of the events occurring, or not occurring, prior to November 9th; the photograph had a reasonable tendency to prove some material fact in issue; it could give a better understanding of the voluminous medical terminology in evidence and the demonstrative evidence; the Trial Court very carefully considered the offer thereof in evidence and in the light of all the facts and circumstances presented we do not believe there was an erroneous abuse of discretion in admitting it in evidence.

Dorrence Kenneth Darling, Sr. was the father, next friend, and guardian of the plaintiff Dorrence Kenneth Darling, II, a minor. The suit is brought in the name of "Dorrence Kenneth Darling, II, a minor, by his father and next friend Dorrence Kenneth Darling," plaintiff. At the outset of the trial a rule was entered excluding the witnesses. The father remained in the court room. The defendant objected to the competency of the father when called as a witness by the plaintiff, because of the rule excluding witnesses and the alleged violation thereof by the father. The objection was overruled. The exclusion of witnesses from a courtroom is a matter resting in the sound discretion of the Trial Court, and its exercise will not be disturbed unless a clear abuse, or prejudice to the defendant is shown: People v. Townsend (1957), 11 Ill2d 30, 141 NE2d 729; People v. Chennault (1962), 24 Ill2d 185, 181 NE2d 74; and the Court had a duty to see that the rights of the minor plaintiff were ade-

322

quately protected: Cf. Muscarello v. Peterson (1960), 20 Ill2d 548, 170 NE2d 564. Being the father and next friend of the minor plaintiff, being named as such in the caption, and being the guardian of the plaintiff, Dorrence Kenneth Darling, Sr. was probably not intended to be included in the scope of the rule excluding the witnesses, and, in any event, the rule could be waived as to a particular witness in the reasonable exercise of the Court's discretion. Permitting this witness to testify was not, under the circumstances, a clear abuse of judicial discretion and no prejudice to the defendant is shown.

In the defendant's cross-examination of the plaintiff's witness Dorrence K. Darling, Sr. it was brought out that he had had a telephone conversation with Dr. Ross, an orthopedic surgeon of Champaign, on November 19, 1960, to get authorization as to the removal of his son from the Charleston Hospital,—he talked to Dr. Ross about the son's case,—Mr. Darling assumed at that time that Dr. Ross had been consulted about it, but he found out differently. In the plaintiff's redirect examination of Mr. Darling the telephone conversation between him and Dr. Ross was brought out to the effect he gave Dr. Ross his name, the son's name, the name of the school, the nature of the injury, and asked if Dr. Ross could give any information on the treatment,—he assumed Dr. Ross was on the case,—Dr. Ross did not know about the accident and had nothing to offer and he said Dr. Peterson, of his office, was not on the case either. That telephone conversation was out of the presence of the defendant or any of its representatives and the defendant now argues it was hearsay and inadmissible. As we read the abstract, we find no objection by the defendant, and particularly no objection on the basis of claimed hearsay, to the bringing out of this telephone conversation between Mr. Darling and Dr.

Ross on the plaintiff's redirect examination. The defendant is in no position now to complain. Beyond that, where a conversation is testified to, the whole of it may be brought out: Butz v. Schwartz (1890), 135 Ill 180, 25 NE 1007; People v. Kalpak (1957), 10 Ill2d 411, 140 NE2d 726; the plaintiff's redirect examination was within the scope of the defendant's cross examination, and the telephone conversation with Dr. Ross was a matter to which the door had been opened by the defendant on cross examination: Star Service & Petroleum Co. v. Short (1951), 344 Ill App 280, 100 NE2d 664; where a conversation is brought out on cross examination, the other party has a right on redirect examination to question the witness as to such conversation, and the cross examining party cannot complain that on redirect the entire conversation is brought out: People v. Kostos (1961), 21 Ill2d 496, 173 NE2d 466. There was no error in this respect.

██ Dr. Clinton D. Swickard, the Chief of Staff at the defendant hospital, testified as a plaintiff's witness. The defendant complains of certain questions of the plaintiff asked on direct or redirect examination. First, the plaintiff asked, on direct, "Where bones in the lower leg are forcibly broken, what type of cast do you apply?" The defendant objected, and, as we read the abstract, the objection was sustained as to form, and the plaintiff then went on to another line of inquiry. Next, the defendant says the plaintiff asked "Don't you always examine closely to see whether a cast should be bi-valved?" but we can find no such question asked or objected to in the abstract. Then the defendant says on redirect the plaintiff asked "The medical authorities to which you made reference earlier, indicate, do they not, that, wherever the patient complains of persistent localized pain, that those symptoms should never be ignored." The defendant objected to that, but immediately withdrew its objec-

tions. Next the defendant says the plaintiff on redirect asked these three questions, to which it objected, and its objections were overruled: "Now, Doctor, is it agreed by medical authority that complaints of pain in a freshly cast limb should not be masked by drugs?"—"And where these signs of pain persist in a freshly fractured limb to which a cast has been applied, then is the procedure which you have discussed, that of bi-valving the cast, followed?"—and "Is there any medical purpose that would be served, then, Doctor, by keeping a heat cradle over a quick drying cast for a period of more than that, a few hours?" The defendant's only stated objections to the first of those three questions was that it was leading, suggestive, and argumentative—to the second that it was objectionable as to form and leading—and to the third it was objectionable as to form. Those questions on the plaintiff's redirect followed the defendant's extensive cross examination of the witness and were within the scope of the cross examination. There was no error in those regards.

During the examination of the plaintiff himself as a witness the stump of the amputated leg and the artificial leg were exhibited to the jury, counsel for the defendant at first saying in the presence of the jury "I have no objection." The defendant then objected out of the presence of the jury that such had no probative value, was not material to any allegations against the defendant, the condition of the limb had been described by other witnesses, and the only purpose was to inflame and impassion the jury, which objections were overruled. The exhibition of an injury to a jury is within the discretion of the Trial Court— a party may demonstrate the nature and extent of the injury, or the disability resulting therefrom, and it is common and correct practice to exhibit the wound or injury to the jury, even where there is no dispute as

325

to the fact and nature of the injury: Stegall v. Carlson (1955), 6 Ill App2d 388, 128 NE2d 352. Permitting the plaintiff to exhibit the stump of his amputated leg is within the sound discretion of the court, even where the injury is fully described otherwise, and only if there be an abuse of such discretion manifestly prejudicing the defendant would such be reversible error: Pusateri v. Chicago City Ry. Co. (1910), 156 Ill App 578. The possibility that the demonstration may be unpleasant or gruesome is not determinative, but should be considered and weighed against the possible usefulness to the jury: Howard v. Gulf Mobile & Ohio R. Co. (1957), 13 Ill App2d 482, 142 NE2d 825. A personal view of the stump and artificial leg here could aid the jury in understanding the voluminous evidence and was relevant as to the nature and extent of the claimed injury and the various elements of the claimed damages. We cannot say the only purpose of the exhibition thereof was to excite the feeling of the jury. There was no abuse of discretion in permitting such here under these circumstances.

 In the direct examination by the defendant of its witness Patricia A. Jenkins, the Director of Nurses at the defendant hospital, she had testified that on Monday, November 7 (1960) she was asked for narcotics by the medicine nurse, Anna Myers. The defendant then asked her what was done and what was said. The plaintiff objected to any conversations out of the presence of the plaintiff. The court indicated the witness might state that she did have a conversation, but not what the conversation was, outside the presence of the plaintiff. The defendant then made an offer of proof that the witness, Patricia A. Jenkins, had a conversation with Mrs. Potts, the 3–11 Supervisor at the nurses' station, with the chart at 4 or 4:30 (on some unnamed date) in which she told Mrs. Potts she was not going to wait to see Dr. Alexander, but she

wanted Mrs. Potts to see that Dr. Alexander saw the foot on this occasion, and Mrs. Potts said she would. The plaintiff objected to the offer of proof as constituting conversation outside the presence of the plaintiff and hearsay. The objection was sustained. The defendant urges these conversations were competent, not to prove the truth of the conversation, but to prove the conversations took place, and, though outside the presence of the plaintiff, the conversations were part of the res gestae. The conversations referred to, being outside the presence of the plaintiff, were hearsay and inhibited, normally, by the hearsay rule. Under certain conditions, though, a spontaneous declaration, or an excited utterance may be properly admissible as an exception to the hearsay rule—i. e., when a declaration is made under the immediate influence of the occurrence to which it relates and so near in time as to negative any probability of fabrication; the factors necessary to bring a statement within this exception to the hearsay rule are an occurrence sufficiently startling to produce a spontaneous and unreflecting statement, absence of time to fabricate, and the statement must relate to the circumstances of the occurrence: People v. Poland (1961), 22 Ill2d 175, 174 NE2d 804. An unspontaneous narrative or recital of a past event does not come within this exception to the hearsay rule: Johnson v. Swords Co. (1936), 286 Ill App 377, 3 NE2d 705; Thompson v. Chicago & C. E. I. R. Co. (1961), 32 Ill App2d 397, 178 NE2d 151. The evidence sought to be elicited as to this witness' conversation with Anna Myers, or with Mrs. Potts, did not come within this exception to the hearsay rule.

 The Court allowed the plaintiff's motion for a directed verdict at the close of all the evidence as to the issue of contributory negligence. The defendant urges the court erred in taking that question

from the jury. During the course of the trial the defendant's attorney had said: We do not contend or assert in this case that the result was caused by any act of the plaintiff." And during the cross-examination of one of the defendant's witnesses, Dr. Hollowell, counsel for the defendant had said "There is no claim on the part of the defendant the hypothetical person caused the loss of his own leg." Following that, the plaintiff made no further effort to adduce proof on that issue. An admission by counsel of a party upon the trial supersedes all proofs upon the point in question: Jenkins v. Hollingsworth (1898), 83 Ill App 139. Whether those acts of the defendant by its counsel be judicial admissions, or a waiver, is immaterial—the defendant, in any event and at least, waived the issue of alleged contributory negligence. There was thereafter no such issue and the court properly withdrew such from consideration by the jury.

 The defendant argues that certain questions of the plaintiff on cross-examination of the defendant's witnesses Dr. Mack W. Hollowell and Anthony J. Perry with regard to certain medical text books and an hospital administration text book, to which its objections were overruled, were improper. On the direct examination by the defendant of Dr. Hollowell, inter alia, a lengthy hypothetical question was put concerning the hypothetical patient, his injury, treatment, etc., and he was asked various questions based thereon and upon his experience and upon his training and upon a reasonable degree of medical certainty, and in response he expressed opinions thereon. We have heretofore endeavored to summarize as briefly as possible what he said. On the cross-examination, in part, he said, without objection by the defendant, he was familiar with the different works on orthopedic surgery such as were in front of counsel; he was familiar with Watson-Jones "Fractures and Joint

Injuries," who is one of the authors in the field. He further said the opinions he'd previously expressed represent current medical thinking in the orthopedic field; the reason he gave his answers has referral to a Dr. Carothers, of Cincinnati, in a book the witness had which he used; he'd looked at Watson-Jones and he'd assimilated those general ideas with his own knowledge and experience and it had formed part of his general background understanding of this problem; he'd read parts of Dr. Ralph De Palma's books and it had become a part of his general understanding and knowledge; and all of those things had entered into his background understanding and knowledge which forms the basis on which the witness had given his prior answers. He was then, inter alia, asked a series of questions on various pertinent medical points and techniques in which attention was directed to various medical text books and he read, or confirmed the correctness of counsel's reading, certain extracts therefrom, to which the defendant objected. On the direct examination of Mr. Perry, the Hospital Administrator of the Decatur-Macon County Hospital, another lengthy hypothetical question was put concerning the hypothetical patient etc., and based upon his experience and qualifications, which included a M. A. degree in Hospital Administration from Northwestern University, he expressed certain opinions in response to several questions. We've previously summarized what he said. On the cross examination he said at Northwestern he'd studied, inter alia, Dr. MacEachern's text book on hospital administration, he studied under him personally, he was an outstanding authority, and Dr. MacEachern's book is in the Decatur Hospital's library, they use it, and it is a recognized text. He was asked if he agreed with certain extracts read from that text book and in most instances he did. As a safeguard upon the reliability

329

of the opinion testimony of an expert witness, such witness, no matter how skilled or experienced, will not be permitted to guess or state a judgment based on mere conjecture: Schwartz v. Peoples Gas Light & Coke Co. (1962), 35 Ill App2d 25, 181 NE2d 826. The plaintiff was entitled to reasonable latitude in the cross-examination of these witnesses; he might test the knowledge possessed by the witnesses of the things they expressed opinions on by any fair means that promised to elicit the truth; ordinarily the limits of cross-examination are within the sound discretion of the Court; assuming to be familiar with standard authoritative works in their respective fields it was not unfair to them to call their attention to applicable parts of those works and ask if they concurred; how could their knowledge be more fully tested?: Connecticut Mut. Life Ins. Co. v. Ellis (1878), 89 Ill 516. An expert witness may be cross-examined as to the basis of his opinion, as to whether the authorities do not lay down a different doctrine, and the like: Chicago Union Traction Co. v. Ertrachter (1907), 228 Ill 114, 81 NE 816. Scientific books are not admissible in evidence as proof of the facts they set forth, but if a witness assumes to base his opinion, in whole or in part, on such books then extracts may be read from them to contradict him; should the expert testify for the first time upon cross-examination that his opinions are based upon, or partly upon, what he has read, the cross-examiner may interrogate him as to the authorities upon which he relies, and then contradict him with those authorities, if he can, the same as if the witness had in the first instance on direct examination testified his opinions were based on such authorities: Wilcox v. International Harvester Co. (1917), 278 Ill 465, 116 NE 151. The medical text books referred to in the cross-examination of Dr. Hollowell had entered into his understanding and knowl-

edge which formed the basis on which he'd expressed his opinions and his opinions were based, inter alia, on his experience and training. The hospital administration text book referred to in the cross-examination of Mr. Perry was a part of his studies, it was in his Hospital's library, and was used, and his opinions were based, inter alia, on his experience and qualifications, part of which necessarily came from Dr. MacEachern's book. The cross-examinations in these respects were proper to test the knowledge of these expert witnesses of the things they expressed opinions on, and to inquire as to the basis of their opinions, and at certain points to contradict them. This is not the type of cross-examination involved in Ullrich v. Chicago City Ry. Co. (1914), 265 Ill 338, 106 NE 828, referred to by the defendant.

 In its brief the defendant next says "further error was accomplished in the use of" plaintiff's exhibit 5, being the Bylaws, Rules and Regulations of the Medical Staff of Charleston Hospital, plaintiff's exhibit 15, being the Standards for Hospital Accreditation of the Joint Commission on Accreditation of Hospitals, and plaintiff's exhibit 8, which contained the Rules and Regulations promulgated by the Illinois Department of Public Health under the Hospital Licensing Act—that "they were incorporated in instructions tendered by the plaintiff (for example, Number 3, Abst 630) . . . ." Plaintiff's exhibits 5 and 15 were admitted in evidence without objection by the defendant, and so far as we can ascertain the same is true as to plaintiff's exhibit 8. Plaintiff's tendered instruction number 3, p 630 of the abstract, was refused. The defendant has nothing to complain of as to the particular matters it suggests in those respects.

 The defendant in its brief then calls our attention to "the prejudice redounding to the defendant from the plaintiff's examination of Hospital Adminis-

trator Perry on certain immaterial assumptions about what he would do if an expectant mother had R. H. negative blood etc." We find no such line of inquiry as to that witness in the abstract.

 In its argument the defendant then urges there was error in the giving of the plaintiff's instructions 3a, 4a, 6a, 7b, 12, 12a, and 18, and in the refusal of the defendant's tendered instructions 10, 11, 14, 15, 18, 19, 20, and 21. In the Points and Authorities part of its brief no specific instructions given or refused are set out, or referred to even by numbers. In the Argument part of its brief the complained of given or refused tendered instructions are referred to only by numbers, and none are set out. There is authority that properly to present the propriety of given, or refused instructions, they should be copied in the appellant's argument: Beebe v. Workman (1948), 336 Ill App 1, 82 NE2d 701; Romines v. Illinois Motor Freight, Inc. (1959), 21 Ill App2d 380, 158 NE 2d 97. It might, accordingly, be said the defendant has waived any point in this respect. Beyond that, as to the plaintiff's given instructions referred to, as we read the abstract, the defendant did not at the conference on instructions object to 4a or 6a and, hence, cannot now complain in any event as to those, and there was no 12. That leaves only the plaintiff's given numbers 3a, 7b, 12a, and 18. The plaintiff's given instruction 3a referred to the bylaws, rules, and regulations of the medical staff of the defendant hospital; 7b referred to the defendant's answer to certain pretrial interrogatories; 12a referred to the duty of the defendant hospital during November, 1960, to use reasonable care to see that only persons duly qualified to perform orthopedic surgery were retained upon the medical staff for the performance of surgery of that type; and 18 related to the wrongful acts of two persons each contributing to a certain injury, without the

fault of the one injured, and said that each wrong-doer is liable for the entire result. The defendant says 3a, 7b, and 18 unduly singled out certain evidence and were argumentative, and 12a was based on an erroneous concept of the law of hospital-patient relations. The defendant apparently does not question the substantive accuracy of 3a, 7b, and 18, and we do not believe they are subject to the procedural criticisms made. Instruction 12a is not inaccurate; what we've already said on the substantive law on this is sufficient; and it was not peremptory in character. As to the defendant's refused tendered instructions referred to, 10 referred to "ordinary care" with respect to the plaintiff; 11 referred to the plaintiff assuming the risk of injury; 14 referred to the plaintiff having the burden of proving certain propositions, including that he was using ordinary care for his own safety; 15 referred to the duty of a hospital to possess and apply the requisite facilities, skill, and care ordinarily used by reasonably well qualified hospitals in the locality or in similar localities in similar cases; and 18, 19, 20, and 21 referred, respectively, to statutes that no person shall practice medicine without a license, no unlicensed person should diagnose or treat human ailments, a person licensed to practice medicine may practice the curative art, and a person so licensed may prescribe treatment of human ailments. Numbers 10 and 14, and to some extent 11, were improper because they related to or included the element of the plaintiff's possible contributory negligence, which was not an issue, under the circumstances, and 11 was inapplicable to the evidence. Number 15 ignored the possible applicability of the Rules and Regulations of the Illinois Department of Public Health, the Standards for Hospital Accreditation, and the Bylaws, Rules and Regulations of the Medical Staff of the defendant hospital. And numbers 18, 19, 20, and 21 were

333

immaterial and irrelevant to the evidence and issues, and were all abstract in form. The defendant's theory of the case was adequately presented in its given instructions. And with regard to the defendant's given instructions, it is interesting to observe that included among them was the defendant's given instruction 23A, which read:

> "In determining the nature of any duty owed the Plaintiff by the Defendant, you should take into consideration the provisions of the evidence in this case on the subject of the rules and regulations of the Hospital Licensing Act of Illinois and of the Joint Commission on Accreditation of Hospitals and weigh these provisions along with all other evidence in the case in determining whether there was a duty upon the defendant to make a decision in the field of the practice of medicine."

So even if the defendant had objected to the plaintiff's given instructions 4A and 6A, which referred, respectively, to the Rules and Regulations promulgated by the Illinois Department of Health under the Hospital Licensing Act and the Standards for Hospital Accreditation of the Joint Commission on Accreditation of Hospitals, and even if those plaintiff's given instructions 4A and 6A were subject to some objection in and of themselves, the defendant's given instruction 23A either waived or cured any objections, had there been any, of the defendant to the plaintiff's given instructions 4A and 6A. Instructions are to be considered as a series.

The defendant says there was prejudicial error in the arguments to the jury by counsel for the plaintiff. The defendant made no objection during any of the opening argument by the plaintiff. Part of this argument included references to what counsel considered reasonable and proper damages, based on

the evidence, if the plaintiff was entitled to recover—being certain figures for loss of earnings, past medical expenses, future expenses, immediate suffering, future pain, loss of leg, and pleasure lost, totalling $180,500. As we understand it, counsel for the plaintiff had also written those elements, suggested figures, and total in black crayon on a sheet of easel paper and displayed such on an easel to the jury towards the end of that argument and referred to such chart in the argument. After that opening argument and display of that chart were completed the defendant then for the first time objected thereto out of the presence of the jury, moved to withdraw a juror, for a mistrial, or to instruct the jury to disregard the chart. The motion was denied. During the closing or rebuttal argument for the plaintiff, counsel said, in part, "What he (Mr. Annis) is saying to you, in effect, 'We owe no obligation to anybody except to take their money. Otherwise, we owe them nothing' ";—"This is the worst record that I can imagine is shown in any hospital in the State of Illinois";—"In my judgment, this was the worst record of any hospital in the entire State of Illinois";—"I say to you that, if the facts in this case, as I view them, are true—and I think they've proved beyond any question of doubt to be true—"; "I have never felt so sorry for anybody in my life,"—; and "my heart went out to that boy when I saw him sit in a chair before you and take off this artificial leg." The court sustained defendant's objections to counsel's references to his own "thinking" and "judgment" and "personal beliefs," instructed the jury to disregard sympathy or prejudice, and cautioned counsel to stay away from comments about how his heart went out. In the defendant's argument to the jury there were references to his having sympathy for the plaintiff and to counsel's personal thinking and beliefs. Having not prop-

erly objected at the time to the references in the plaintiff's argument to what counsel considered reasonable damages, based on the evidence, and to the chart, the defendant, cannot now complain and, in any event, this particular type of chart was proper as a mere illustration of counsel's argument—it showed the jury visually nothing more than the jury heard orally: Caley v. Manicke (1962), 24 Ill2d 390, 182 NE2d 206. As to the other matters, counsel may, within the limits of the record, be vigorous and eloquent and make fair comment on or draw fair inferences from the evidence in their argument—the court sustained several of the defendant's objections, appropriately instructed the jury, and cautioned counsel—and some of what counsel for the plaintiff said was invited by some of what counsel for the defendant had previously argued. We perceive no error in this respect of such a prejudicial nature as to deprive the defendant of a fair trial.

 The point of the defendant that the court erred in denying its motion to reduce the ad damnum under Count I to $100,000, the limit of its liability insurance policy, and in denying its post-trial motion, inter alia, to reduce the verdict and judgment to $100,000 is not well taken. The trust funds of a charitable corporation are immune from liability for the torts of the corporation; except as to its trust funds, though, it is liable: Moore v. Moyle et al. (1950), 405 Ill 555, 92 NE2d 81. There is nothing in the complaint on this subject. There is nothing in the defendant's answer on the subject. The only reference in the pleadings as to the particular nature of the defendant and the particular character of its assets is in the defendant's motion to reduce the ad damnum of Count I to $100,000. That motion, and the affidavit accompanying it, allege, so far as now especially relevant, that "the only funds available to satisfy the

336

judgment, other than trust funds held for specific uses and funds held for expansion, improvements, developments, and such hospital purposes as the Board of Directors may deem necessary, would be the proceeds from a certain insurance policy, the limits of which are one hundred thousand dollars ($100,000)." Under ch 110 Ill Rev Stats 1963, § 33, all pleadings shall contain a plain and concise statement of the pleader's defense, and under § 43 the facts constituting any affirmative defense must be plainly set forth in the answer. Although this motion and accompanying affidavit are not controverted, the allegations thereof as to what are the defendant's alleged "trust funds" are not plain and concise and are not plainly set forth. In particular, the phraseology "and funds held for expansion, improvements, developments, and such hospital purposes as the Board of Directors may deem necessary" is vague, indefinite, not clear, not explicit, and, in part, a conclusion of the pleader and affiant. So far as those allegations are concerned there may be nontrust funds other than the insurance policy proceeds referred to.

Accordingly, the judgment will be affirmed.

Affirmed.

SPIVEY and SMITH, JJ., concur.